**General Civil and Domestic Relations Case Filing Information Form**

⚡ EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 04, 2019 01:54 PM

*(signature)*
(Angie T. Davis, Clerk of State Court
Cobb County, Georgia)

☐ **Superior or** ☑ **State Court of** _____Cobb_____ **County**

**For Clerk Use Only**

**Date Filed** ___01-04-2019___    **Case Number** ___19-A-41___
MM-DD-YYYY

**Plaintiff(s)**

Howard, Robert

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Robert Howard, Admin of Estate Christopher How | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|

**Defendant(s)**

Conway, R.L. (Butch)

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Woods, Frank | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Dennis, Dominique | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Ross, Gregory | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|

**Plaintiff's Attorney** ___Harman, Matthew___    **Bar Number** ___327169___    **Self-Represented** ☐

## Check One Case Type in One Box

**General Civil Cases**

- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Automobile Tort
- ☐ General Tort
- ☐ Contract
- ☐ Real Property
- ☐ Civil Appeal
- ☐ Habeas Corpus
- ☐ Restraining Petition
- ☐ Injunction/Mandamus/Other Writ
- ☐ Garnishment
- ☐ Landlord/Tenant
- ☑ Other General Civil

**Domestic Relations Cases**

- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Adoption
- ☐ Family Violence Petition
- ☐ Other Domestic Relations

**Post-Judgement – Check One Case Type**

- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony.
- ☐ Modification
- ☐ Administrative/Other

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all the same parties, subject matter, or factual issues. If so, provide a *case* number for each.

_____    _____
**Case Number**             **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. §9-11-7.1.

☐ Is interpreter needed in this case? If so, provide the language(s) required. _____
**Language(s) Needed**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

# STATE COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER  19-A-41

$199.00 COST PAID

Howard, Robert
Robert Howard, Admin of Estate Christopher
Howard

---

**PLAINTIFF**

**VS.**

Conway, R.L. (Butch)
Woods, Frank
Dennis, Dominique
Ross, Gregory
DeVries, Aaron
Thurman, Amber
Green, Adam
Hartman, Philip
Nichols, Ilene
Hayes, Thomas
Campbell, Martin
Williams, Darius
Lopez-Razo, Juan
Thornton, James
Casey, James
Correct Care Solutions LLC
Dillon, Catherine
Edouard, Myriam
Gwinnett County
Does 1-10
Barclay, Estella

---

**DEFENDANTS**

# STATE COURT OF COBB COUNTY
# STATE OF GEORGIA

## SUMMONS
TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Matthew Harman**
**Harman Law LLC**
**3414 Peachtree Road**
**Suite 1250**
**Atlanta, Georgia 30326**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 4th day of January, 2019.**

Clerk of State Court

Angie T. Davis, Clerk of State Court
Cobb County, Georgia

**EFILED IN OFFICE**
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

19-A-41

JAN 04, 2019 01:54 PM

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

IN THE STATE COURT OF COBB COUNTY
STATE OF GEORGIA

ROBERT HOWARD, individually and as
Administrator of the ESTATE OF
CHRISTOPHER HOWARD,

      Plaintiff,

        v.

R.L. "BUTCH" CONWAY; GWINNETT
COUNTY; CORRECT CARE
SOLUTIONS LLC; FRANK WOODS;
DOMINIQUE DENNIS; GREGORY
ROSS; AARON DEVRIES; AMBER
ASHLEY THURMAN; ADAM GREEN;
PHILIP HARTMAN; ILENE NICHOLS;
THOMAS HAYES; MARTIN
CAMPBELL; DARIUS WILLIAMS; JUAN
LOPEZ-RAZO; JAMES THORNTON;
JAMES CASEY; CATHERINE DILLON;
MYRIAM EDOUARD; ESTELLA
BARCLAY; AND DOES 1–10,

      Defendants.

Civil Action No.

**Jury Trial Demanded**

## COMPLAINT

Robert Howard, individually and as Administrator of the Estate of Christopher Howard

brings this action against defendants R.L. "Butch" Conway; Gwinnett County; Correct Care

Solutions LLC; Frank Woods; Dominique Dennis; Gregory Ross; Aaron DeVries; Amber

Ashley Thurman; Adam Green; Philip Hartman; Ilene Nichols; Thomas Hayes; Martin

Campbell; Darius Williams; Juan Lopez-Razo; James Thornton; James Casey; Catherine Dillon;

Myriam Edouard; and Estella Barclay (collectively "Defendants") and alleges as follows:

1

## FACTUAL BACKGROUND

### I.    Summary of Christopher Howard's Death

1.    On February 15, 2017, Christopher Howard ("Chris") was charged with violation of probation by allegedly testing positive for marijuana. Lawrenceville police arrested Chris and transported him to Gwinnett County Jail.

2.    At approximately 11:19 p.m. on February 15, 2017, Chris entered an admissions cell known as "Cell 2."

3.    At approximately 11:21 p.m. Chris began having a seizure.

4.    In a written statement, Defendant Hartman stated:

> On Thursday, February 15, 2017, I, Cpl. Hartman (SO 1167) was assigned to Admissions for Morning Watch at the Gwinnett County Jail. While I was conducting Admissions Count the inmates who were in Admissions Holding Cell 2 began banging on the door. I went over to the cell and saw Inmate Christopher Howard (Inmate ID 99536297) on the floor near the phone. Inmate Howard appeared to be having a seizure. I then notified Central Control that Admissions had a Medical Emergency.

5.    In a written statement Defendant Dennis stated:

> On February 16, 2016, I Deputy D. Dennis SO 1357 of the Rapid Response Team (RRT) was assigned to Internal Security for the hours of 1800-0600. At approximately 2315 hours multiple inmates inside of Admissions Cell 2 began banging on the door and yelling that there was someone having a seizure inside the cell. Upon arriving to the cell, I saw an Inmate (later identified as Howard, Christopher #99536297), on the floor appearing to have a seizure. I then, along with other responding deputies entered the cell in order to assist in moving Inmate Howard away from the cell wall and rotating him over to his side in order to keep him from aspirating. Once Inmate Howard came out of his seizure, he appeared to be in a confused state and became very combative and aggressive by thrashing his legs, clinching his arms, and trying to get up off of the cell floor as deputies struggled to maintained control of him.

6.    In a written statement, Defendant Lopez-Razo stated:

> On February 15, 2017, I, Deputy Lopez-Razo (SO1257) was working Admissions for the remainder of Evening Watch. At approximately 2320

2

hours there was a loud banging sound coming from holding cell (#2) in the admissions area. When I looked in the direction of the sound I could see a couple of inmates yelling to get someone's attention. I then closed cell (#4) doors in admissions area and then guided the inmates out of cell (#2) to have a seat in the admissions benches to secure the area. Once I entered cell (#2) I noticed that Inmate Howard, Christopher #99536297 was lying on the ground and being restrained by Cpl. Ross, D/S Devries, D/S Thurman and D/S Dennis due to Inmate Howard being combative.

7.    In a written statement, Defendant DeVries stated:

On the 15th day of February, 2017, I, Deputy DeVries SO1398, was working my assigned post in Pre-Admissions from the hours of 1800-0600. At approximately 2321 hours, I heard Corporal Hartman SO1267 notify Central Control via radio that he had a medical emergency in Admissions Cell 2. I immediately retrieved the transport chair from the Pre-Admissions area and responded to the emergency. As I got to Admissions Cell 2, I notice Inmate Howard, Christopher #99536297 on the floor and appeared to be having a seizure. Corporal Ross SO390, Deputy Lopez-Razo SO1257, Deputy Thurman SO1241, Deputy Dennis SO1357, Deputy Green SO1493, and I assisted in placing Inmate Howard into the recovery position. I then instructed Deputy Lopez-Razo to find some towels to place under his head. At some point during the emergency, one of the nurses yelled across the room, "make sure he's still breathing." Deputy Dennis then instructed them to come to us to help. As Inmate Howard began to regain consciousness, he became confused and combative. We then moved him to his stomach in order to maintain positive control of Inmate Howard for our safety as well as his own. Deputy Thurman maintained control of Inmate Howard's legs, I maintained control of his left arm, Corporal Ross and Deputy Lopez-Razo maintained control of his left and right arm. Inmate Howard attempted to break free of our control and nearly kicked Deputy Thurman off of him.

8.    In a written statement, Defendant Barclay stated:

I went to medicate patients in admission on the night of the incident, February 16, 2017, I was awaiting the Deputies to assist me in medicating the patients, when we heard a loud noise coming from in one of the rooms. The inmates were calling for help and said there was someone on the ground having seizures. We went to the scene immediately, and the patient was having seizures.

9.    In a videotaped interview, Defendant Nichols stated:

I was already headed down to admissions because it was shift change morning watch was about to come on. I was in the office and I heard

banging on the admissions cell, cell number two. And an inmate was standing there banging saying he had an emergency. I was in the office, Cpl. Ross I think Cpl. Hartman was there so they're going we are all going, Sgt. Thornton and I we are heading down that way. I am trying to think of what other deputy was over there at the time. When they opened the cell door we saw a guy having, the inmates kind of spread, an inmate was on the floor having a seizure by the phones. They cleared all the inmates out we were trying to get them cleared out we called the nurses over. We went on the radio and said there was a medical emergency so central 10-3. Inmates were cleared out we were waiting for the nurses to come over. Then other deputies came, the RRT deputies were coming over since it was a medical emergency. And the guy was thrashing pretty well so they were all kind of gathered around him and we were waiting for the nurses to come in. They finally came in, one sort of stood off to the side, the other ones were kind of standing there, but he was fighting pretty good trying to come out of it.

10. In a written statement, Defendant Ross stated:

Cpl. Ross secured Howard's arms so Howard would not inadvertently strike a deputy assisting him or the ground. Howard, perhaps due to post seizure disorientation, seemed to be both confused and agitated that deputies were securing his appendages. From Cpl. Ross' knowledge, training & experience, the behavior of individuals disaffiliating with seizure like signs can range from docile to very aggressive. Cpl. Ross, as well as the other deputies involved, maintained control of Howard as it appeared that Howard was closer to the aggressive end of the spectrum.

11. In a written statement, Defendant Lopez-Razo stated:

I was then advised by D/S Devries to go get towels, to which I did and then returned to give the deputies that were restraining Inmate Howard. I then notice that Cpl. Ross was losing his grip of Inmate Howard's left arm and stepped in to assist in restraining Inmate Howard as he continued to be combative with Deputies and Medical Staff.

12. In a written statement, Defendant Green stated:

At approximately 2321 hours a medical emergency was called in the admissions area cell #2. When I arrived to the admissions area Inmate Howard, Christopher #99536297 was on the ground under control by the other deputies I gained head control to ensure that if Inmate Howard had another seizure he would not hit his head on the ground.

13. In a written statement, Defendant Thurman stated:

4

When Inmate Howard came out of his seizure, he became combative by thrashing his legs, clinching his arm, and trying numerous times to get off the floor. I then placed my weight on top of Inmate Howard's legs in order to prevent him from moving. After a few moments, I then had to have some assistance staying on top of his legs. I placed my left hand on the wall and held onto Deputy Dennis to prevent myself from being kicked off. When I realized that wasn't working, I then gained left leg control and grabbed the back of Deputies Devries and Lopez-Razo's vest. I was still having trouble maintaining leg control; Deputy DeVries then wrapped his arm through the shoulder strap of my vest to prevent me from being kicked off. Lopez-Razo then reached around my back and grabbed the back of my vest and pushed me down. I was still being pushed upwards but able to maintain leg control at the time.

14. In a written statement, Defendant Thurman stated: "I then instructed Deputy Thurman gain control using the leg-lock technique for better control and the safety of the Nurses, assisting Deputies, and himself."

15. In reality, however, Chris was not "combative" or "aggressive." Rather he was experiencing common, and dangerous, symptoms of a generalized seizure, which include involuntary thrashing movements.

16. In a videotaped interview, Defendant DeVries was asked, "Would it be safe to say that when he's coming out of this and he's in a medical agitated state, not in a defensive, 'I want to fight you' state?" Defendant DeVries responded, "Medically, yes. Medically, he, it's clear that he was having a legitimate seizure, didn't know what was going on."

17. In a videotaped interview, Defendant Lopez-Razo was asked, "Did you feel like he was being aggressive in a, as in a use of force aggression, or as in a medical state aggression?" Defendant Lopez-Razo responded: "Medical state. He just didn't know where he was at."

5

18.     It is common knowledge, even among lay people, that you should not try to hold down or "control" a person who is experiencing a generalized seizure, which includes uncontrolled thrashing movements.

19.     Rather than provide medical attention, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman, violently restrained Chris throughout the seizure. As many as five of these Defendants at a time violently physically restrained Chris.

20.     The autopsy report shows extensive evidence of acute physical injuries that Chris did not have prior to entering Gwinnett County Jail, including extensive abrasions and contusions all over his body.

21.     Most seizures do not last longer than two minutes.

22.     A seizure lasting longer than five minutes is called status epilepticus. Status epilepticus is a life-threatening medical emergency that requires treatment in a hospital setting.

23.     After approximately nine minutes of Chris's seizure, Defendant Dennis instructed Defendants Lopez-Razo, DeVries, Thurman, and Ross to handcuff Chris.

24.     Handcuffing, or restraining in any way, a person having a seizure is extremely dangerous.

25.     In a written statement provided to the PSU, Defendant Lopez-Razo stated: "Deputy Dennis then advised me, D/S DeVries, D/S Thurman, and Cpl. Ross to secure Inmate Howard in handcuffs. Once Inmate Howard was secured in handcuffs, Inmate Howard was given a needle shot by the medical staff."

26.     In a written statement, Defendant Dennis stated: "I then assisted in maintaining control of Inmate Howard's right and left arm as each of his hands were secured in handcuffs."

27.     In a written statement, Defendant DeVries stated: "Deputy Dennis then instructed us to place him into handcuffs for safety purposes."

28.     Defendants Nurse Dillon, Nurse Edouard, and Nurse Barclay responded to Cell Two during Chris's seizure.

29.     Defendants Dillon, Edouard, and Barclay, however, did not provide any medical care while Chris's seizure continued for over 12 minutes.

30.     After approximately 12 minutes, Defendant Edouard administered an injection of Ativan, an anti-seizure medication.

31.     In a written statement, Captain Hayes stated:

> Eventually, the nurses decided to use medication to try to help Inmate Howard de-escalate or calm down. Lt. Nichols and I had briefly mentioned how slow the nurses were responding and the fact that it was taking multiple nurses to prepare the syringe with the medication and then to administer the injection. At one point, I called Central Control on my phone and asked them to make a video of the incident. I requested the video so I could review the incident to see if the nurses were moving as slowly as I thought they were. After watching the video, I determined that I placed my call to Central Control at 2327 hrs.

32.     In a videotaped interview, Captain Hayes further stated that it was not the first time he had seen a problem with the nursing staff responding too slowly.

33.     In a written statement, Defendant Nichols stated:

> The nurses began searching their equipment and re-entered the cell with a syringe and a vial of medication. Nurse Edouard attempted to fill the syringe, then passed it to the other nurse, who filled it for her. The RRT deputies continued to hold Inmate Howard and Cpl. Ross kept attempting to reassure him and keep him calm. Nurse Edouard gave Inmate Howard an injection in his hip then left the cell.

34.     In a written statement, Defendant Dennis stated:

> I then assisted in maintaining control of Inmate Howard's right leg by holding on to it in order to keep Inmate Howard from kicking one of the responding medical staff members as they were preparing to give Inmate

7

Howard a shot of medicine via his buttocks. Once the shot was given, Inmate Howard continued to be combative on the ground and attempted to kick and fight his way out of the control of RRT deputies. It was at this time that all responding medical staff members exited the cell and appeared to resume their duties in the admissions area. During this time Inmate Howard stated approximately two different times that he could not breathe and that he was going to throw up.

35.   In a written statement, Defendant Thurman stated:

Nurse Edward [Edouard] was then able to give Inmate Howard a shot of Ativan, 1 milligram, in the right gluteus maximus. Once the shot was given, Inmate Howard continued to be combative on the ground, attempted to kick, and fight his way out of my (Deputy Thurman) leg control. All medical staff then exited the cell and resumed their normal duties. At the same time, Inmate Howard stated that he was unable to breathe and felt like he was going to throw up. Inmate Howard was rolled to his left side to help him breathe and so that he wouldn't throw up on himself. Inmate Howard continued to be combative so he was rolled back onto his stomach so that we would have better control of his hands and leg.

36.   In a written statement, Defendant Dillon stated:

The deputies held him down for about 10 to 15 minutes and inmate Howard was still fighting. At one point Inmate Howard said "I can't breathe". I Catherine said let go of him so he can breathe, and the deputies left [lift] him up and put him in a restrained chain [chair] and strap inmate in the chain [chair].

37.   The seizure continued for an additional approximately 4 minutes after the nurses injected Ativan, making the total duration of Chris's seizure approximately 16 minutes.

38.   During this time, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman violently restrained Chris, including placing him in handcuffs while he was having a seizure.

39.   Jail surveillance video showing Chris's seizure and the response to it are available at https://www.youtube.com/watch?v=F2jg_6Xd_fY&feature=youtu.be (cited below as "Cell 2 Surveillance Video") and incorporated in this Complaint by reference.

8

40.     A seizure lasting longer than approximately five minutes is a medical emergency for which emergency medical personnel should be called immediately, and/or emergency medical care should otherwise be provided to the patient.

41.     Rather than call 911 or otherwise provide emergency medical care to Chris, Defendants Dillon, Edouard, and Barclay simply instructed the jail staff to take Chris to the jail's medical department (known as "JJ Medical") "immediately."

42.     Rather than take Chris to JJ Medical, however, the deputies placed him in an admissions cell known as "Cell 13."

43.     In a written statement, Defendant Thurman stated: "Nurse Edward [Edouard] then stated that Inmate Howard needed to be taken to Housing Unit JJ Medical."

44.     In a written statement, Defendant Thurman stated: "The Nurses then determined Inmate Howard's conditions to be clear from Admissions to be sent JJ Medical."

45.     The Defendant Nurses contacted Dr. Shahzad M. Hashmi, an employee or agent of Defendant Correct Care Solutions LLC. In a written statement, Dr. Hashmi stated, among other things:



Howard, Christopher DOB 1-19-1994 was brought to GCDC around 04:30 PM on 2/15/2017. Patient was screened around 11:00 PM.

Patient provided us with following information about his medical history

1) He had no Meds Allergies
2) He had no acute illness except MCAD (Medium-chain acyl-CoA dehydrogenase deficiency) and patient stated at intake that his brother died of MCAD.
3) No current medications and no drugs use

His Vital Signs at intake were

Blood Pressure 129/71 Pulse 88, R 16 / min, Temp 98.6, O2 Sat 98 % at room air and BSR 94 mg/dl WT 195 lb, HT 6.5.

Patient was reported to have a seizure episode at 11:25 PM in his cell and was provided medical care by nursing staff. Following his seizure patient became agitated and was administered Ativan injection 2mg. Patient oxygen Saturation was 98% however unable to obtain other vital signs due to agitation.

At 11: 47 PM I received a call from admission.

Based on information provided by the nurse, I gave the following orders

1) ASAP transfer to the infirmary for further monitoring.
2) ACCU Check BID for 5 days
3) Keppra 500 mg po BID 45 days.
4) Neuro check Q6 hourly for 48 hours

Subsequently patient was transferred to infirmary at 00:33 on 2/16/17 as per nursing staff.

At 00:33 received a call from the infirmary stating patient had arrived with security and upon arrival found to be pulseless. CPR had been initiated and 911 had been notified as per nurse.

46.    In a written statement, Defendant Dennis stated:

Nurse Edouard then stated that Inmate Howard needed to be taken to Housing Unit JJ Medical. Due to Inmate Howard still being combative, I then told Deputy Devries to ask the medical staff if Inmate Howard could stay in Admissions Cell 13, which is commonly used for medical observation, until he calmed down, in order to prevent having to struggle or fight with him in the dress out room while trying to dress him into an inmate uniform after already having a seizure."

47.    In a videotaped interview, Defendant Dennis was asked why the deputies did not take Chris to JJ Medical in his current attire. Defendant Dennis stated: "I've never encountered

10

a situation where we've taken an inmate down to JJ or anywhere throughout the jail with regular clothes on."

48. In a written statement, Defendant DeVries stated:

> The nurses then requested that we get him to JJ-Medical immediately. Due to his combative state, Deputy Dennis made a tactical suggestion that we place him inside Admissions Cell 13 in order for him to calm down. I asked the nurses if this was okay and they said "he needs to go to JJ ASAP." The nurses then began converse among themselves to talk to the Admissions Supervisor about the situation. I then suggested that we just take Inmate Howard down to JJ-Medical in his personal clothes for immediate treatment and change him into a county uniform after he calmed down. I did not get a response to my suggestion.

49. In a written statement, Defendant Thurman stated:

> Due to Inmate Howard being combative, it was then determined that he would be placed in Admissions Cell 13 to be observed by the admissions medical staff as he calmed down and recovered from his seizure before being dressed in and taken to JJ Medical. Deputy Dennis then retrieved the transport chair and I was given instructions to relinquish leg control.

50. Video of Chris shows, however, that he was not combative. Rather he was docile and extremely weak. Defendants had to lift him into the transport chair because he could not stand on his own. *See Cell 2 Surveillance Video*, https://www.youtube.com/watch?v=L2jg_6Xd_fY&feature=youtube, at 19:10–19:30.

51. In a written statement, Defendant Hartman stated: "Inmate Howard was then helped into the Transport Chair and taken to Admissions Cell 13. Nurse Edouard told me (Cpl. Hartman) that Inmate Howard needed to go to JJ Medical as soon as possible."

52. In a videotaped interview, Defendant Lopez-Razo stated: "Yes, I think medical said he needed to go to JJ, but he was still in his civilian attire so he needed to be changed out. SO I believe he was in 13 to get changed out and then go to JJ."

53.     In a videotaped interview, Defendant Dillon explained that she and other nurses told the deputies multiple times that Dr. Hashmi has ordered that Chris be taken to JJ Medical immediately. Defendant DeVries responded that his squad leader, Defendant Dennis has instructed them to take Chris to Cell 13 instead. Defendant Dillon then said, "you people do what you need to do we are telling you he needs to go to medical immediately."

54.     Instead of taking Chris to JJ Medical immediately as instructed by the medical professionals, Defendants Dennis, DeVries, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton placed Chris in a restraint chair and left him in the admissions area just outside of Cell 2.

55.     When the deputies placed Chris in the transport chair he was obviously not combative, he obviously did not need to "calm down," and he was obviously in need of emergency medical care.

56.     In a videotaped interview, Defendant DeVries stated that when they placed Chris in the transport chair he was "dead weight," he "wasn't able to pick himself up at all," and he was unable to speak, but was "kind of moaning."

57.     Defendant DeVries further stated that his "gut instinct" at this time was "get him to medical," that he heard the nurses say Chris needed to go to medical, and that he suggested they simply take Chris to medical in his personal clothes.

58.     The nurses again attempted to examine Chris, but Defendants Dennis, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton prevented them from doing so.

59.     Defendant Hayes stated in a written statement that while in the restraint chair outside of Cell 2 Chris was calm and not aggressive.

60. At this time, Defendant Nurse Barclay again instructed the deputies to take Chris to JJ Medical.

61. At this time, both Nurse Edouard and Dillon told again the deputies that Chris needed to go to JJ Medical immediately.

62. Instead of taking Chris to JJ Medical immediately as instructed by the medical professionals, Defendants Dennis, DeVries, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton took Chris to Cell 13 via the restraint wheelchair.

63. In a videotaped interview, Defendant Campbell stated: "Unfortunately, we have so many seizures around here it's kind of like—I related it to the story of the boy who cried wolf."

64. When Chris was taken to Cell 13, he was obviously not combative.

65. Rather, he was unable to even get out of the transport chair under his own power.

66. When Chris was taken to Cell 13, he was obviously in need of emergency medical care.

67. In a videotaped interview, Defendant Casey stated: "I saw they had to help the guy kind of get into the cell and then they closed the door and then everything went on about its business . . . ."

68. In a written statement, Defendant Lopez-Razo stated: "Once in cell #13 Inmate Howard was helped out of the transport chair and placed onto his belly on the floor of the cell."

69. In a written statement, Defendant DeVries stated: "Deputy Lopez-Razo and I assisted Inmate Howard out of the transport chair and on to his belly inside of Admissions Cell 13."

13

70.	When asked if Chris was "still dead weight" when they placed him in Cell 13, Defendant DeVries stated, "Yes, ma'am."

71.	In a written statement, Defendant Dennis stated: "I then escorted Inmate Howard to Admissions cell 13 via the transport chair. I then assisted in standing Inmate Howard to his feet and then laying him down on the ground inside the cell."

72.	Jail surveillance video showing Chris in Cell 13 is available at https://www.youtube.com/watch?v=kbMeiY-1S3k&feature=youtube (cited below as "Cell 13 Surveillance Video") and incorporated in this Complaint by reference.

73.	Defendant Dennis further stated that because Cell 13 is right in front of the supervisors' office, the supervisors could see they were leaving Chris in Cell 13. Accordingly, Defendants Campbell and Casey knew Chris was left in Cell 13 even though medical professionals had ordered Chris to be taken to JJ Medical immediately and took no action to correct the situation.

74.	In Cell 13, for approximately 30 minutes, Chris writhed on the ground in pain, occasionally making it to his knees to bang on the window and beg for help. *See Cell 13 Surveillance Video.*

75.	In a videotaped interview, Defendant Campbell stated that he passed by Cell 13 and looked in on Chris and Chris was "struggling to breath."

76.	Yet Defendant Campbell did not provide any assistance to Chris.

77.	In a written statement Sergeant Welch stated:

> While we (Sgt. Welch) were all still in the area of the Sergeant's Office, the Admission Nurse stepped to the door of the office at approximately 00:20, handed Sgt. Campbell a plastic bag with Mr. Howard's medical paperwork, and told him that Mr. Howard was ready to be sent to JJ-Medical. I witnessed Sgt. Campbell pass this information on to RRT

14

Squad Leader Dennis, who confirmed that they would get Mr. Howard dressed into a GCDC Uniform and take him to JJ-Medical immediately.

78. In a written statement, Defendant Campbell stated:

At about 0022 hours, Nurse Edouard from the Med2 Station, looked into cell #13 and told Corporal P. Hartman {SO-1167} that Howard needed to be sent to JJ-Medical as soon as possible because he did not look good. I immediately called on the radio for either Deputy D. Dennis {SO-1357} or Deputy D. Williams {SO-1416} to meet with me in Admissions. Both deputies arrived instead of just one. I explained that Howard needed to be dressed into a jail uniform and escorted to JJ-Medical.

79. After approximately 30 minutes in Cell 13 while Chris's medical emergency continued, deputies finally came to get him.

80. By that time, Chris's crisis had worsened, and his condition further declined.

81. The deputies, however, still did not take Chris to receive medical attention. Rather, they took him to yet another room within the jail to change his clothes to a jail uniform.

82. In a videotaped interview, Defendant Campbell stated: "I guess it is normal procedure for them to be in uniform before going to JJ Medical."

83. Rather than get Chris the emergency medical attention he obviously needed, Defendants Hartman, DeVries, Williams, and Dennis changed Chris's clothes, further delaying life-saving medical treatment by at least 12 minutes.

84. In a written statement, Defendant Hartman stated:

Nurse Edouard told me that Inmate Howard needed to go to JJ Medical as soon as possible. About five minutes later I opened the cell door and asked Inmate Howard if he could stand up. Inmate Howard said he could not. I then helped Inmate Howard sit up. At that time Deputy Devries (SO 1398) entered the cell and assisted me with putting Inmate Howard in the Transport Chair. Inmate Howard was then escorted to the dress out room. Deputies Williams (SO 1416), Dennis (SO1357), Devries and I helped dress Inmate Howard into a Gwinnett County Jail uniform. When we finished Deputies Dennis and Williams escorted Inmate Howard to JJ Medical by using the Transport Chair.

85.    In a videotaped interview, Defendant Hartman further stated: "We got him in the transport chair (from 13) and took him to the dress out room and he left the admissions area."

86.    In a written statement, Sargent Welch stated: "Mr. Howard was assisted to a Transport Chair and taken to the Property Room. Once the Dress-in Process was complete, he was escorted to JJ-Medical by RRT Deputy Dennis and RRT Deputy D. Williams."

87.    In a written statement, Defendant DeVries stated: "I noticed that Inmate Howard was very weak and could not stand on his own. We then escorted him to the Dress In room to be changed over into a county uniform. Inmate Howard was too weak to stand or dress himself."

88.    In a videotaped interview, Defendant DeVries further stated that Chris was clearly "out of it," his breathing was slow, his eyes were closed, he was unable to move, and he was not acknowledging any questions.

89.    Jail surveillance video showing the deputies retrieving Chris from Cell 13 and transporting him to "property" is available at https://www.youtube.com/watch?v=AKbOd7RIgZE&feature=youtube and incorporated in this Complaint by reference.

90.    In a written statement, Defendant Williams stated:

> At approximately 0020 hours I and Deputy Dennis were called via radio from admission advising that here was an inmate that needed to be dressed out and escorted to JJ Medical. Inmate previously had a medical emergency in Admission. Once arriving to Admission Inmate Howard Christopher (99536297) was being escorted via transport chair to the property dress out room. Once inside I then assisted along with other Rapid Response Team helping inmate Howard dress out into a county issued uniform. Once inmate Howard was dressed out I along with Deputy Dennis escorted him down to JJ Medical. While escorting inmate Howard down to JJ Medical I begin to talk to inmate Howard making sure he was alert. He showed slight signs of movement but no verbal response.

91.    After changing a largely lifeless Chris into a county uniform, the deputies finally, casually transported him to JJ Medical.

92.    Video shows that in the transport chair Chris was limp and unconscious. His leg fell off the transport chair twice and Defendant Williams had to put it back on. In a videotaped interview, Defendant Williams stated: "At that time I said to [Defendant] Dennis, 'we need to hurry up and get him to medical now.' And at that moment we didn't run with him, but we kinda speeded up our pace to get him to JJ."

93.    Jail surveillance video showing the deputies transporting Chris from "property" to JJ Medical is available at https://www.youtube.com/watch?v=AzJaaPh2dHM&feature=youtu.be and incorporated in this Complaint by reference.

94.    When Chris finally arrived at JJ, Defendant Dillon said to the deputies, "Ya'll brought a dead man."

95.    In his written statement, Defendant Williams further stated:

> Once we arrived to JJ Medical we were asked by the medical staff "why is this inmate coming down here". I replied we were told by the medical staff in Admission that inmate Howard needed to come down. The nurse Annabo replied "this inmate is sick and non-responsive he need to go to the hospital". Nurse then checked inmate Howards vital and noticed that he had no pulse.

96.    Defendant Dennis stated:

> At approximately 0025 hours Deputy Williams and I arrived to Housing Unit JJ Medical. Once in Housing Unit JJ Medical, I instructed the Housing Unit Deputy, Deputy Salnave S01492, to place the female inmate who was being seen by the nursing staff into a cell and asked the JJ Medical Nurse Idubor if she needed to check Inmate Howard's vital signs before placing him in a cell. The Nurse Idubor immediately looked at Inmate Howard and asked "why is he coming down here." I then replied that the admissions medical staff, Nurse Dillon and Edouard, said that he needed to be sent to JJ Medical. The JJ Medical nurses (Nurse Idubor and Nurse Bucknor) then said "this guy does not look good at all," "he's

unresponsive," and, "he needs to go out," "call 911." Deputy Williams then asked "should we start doing CPR?" Nurse Bucknor said "yes."

97.  In nursing progress notes, Nurse Bucknor stated:

02/16/2017 at 00:33, Patient (Christopher Howard) brought to JJ Medical via Transport Chair accompanied by the deputies. Upon arrival nurse immediately notice patient was unresponsive, no spontaneous breathing, heart sound not audible, pulses not palpable, skin temperature very cold to touch, pale eyes fixed and dilated. Instantly deputies were told to unstrap patient from the transport chair and place patient on the floor for emergency care. Deputy on duty in JJ Medical was instructed to call Medical Emergency and call 911. At 00:34 CPR was started, oxygen, arabu (sp) bag, and AED applied. Through CPR AED Machine advised no schock (sp). Dr. Hasmi made aware of patient condition and was advised to continued CPR. Patient remained unresponsive, no pulse or signs of breathing. At 0047 911 arrived and continued with CPR. Patient left JJ Medical via stretcher at 00:55 and patient was still unresponsive and pulseless.

98.  In nursing progress notes, Nurse Idubor stated:

02/16/17 00:33 Inmate arrive [sic] in JJ strapped in the transport chair accompanied by the deputies. We immediately notice inmate was unresponsive, pale, skin, cold to touch, both eyes fixed & dileted [sic], no chest movement noted. Immediately, deputies were asked to unstrap inmate from the transport chair and placed on the floor for emergency care. Unable to palpabe [sic] pulse or obtained vitel [sic] signs. Instantly deputy was instructed to call for medical emergency and 911. CPR was initiated at 00:34, oxygen was given AED machine advised no shock to continue CPR. Dr. Hasmi was informed of inmate general condition and advised to continue with CPR. Inmate was still unresponsive. Still unable to obtained vls [sic]. At 00:47 911 arrive in JJ and continued with the CPR. The inmate left JJ in stretcher at 00:55 still unresponsive.

99.  At approximately 1:00 a.m. on February 16, 2017, Chris was finally taken to a hospital, Gwinnett Medical Center.

100.  At Gwinnett Medical Center, Chris was diagnosed with anoxic encephalopathy secondary to cardiac arrest progressed to brain death.

101.  Chris never regained consciousness.

102.  Chris died on February 17, 2017.

18

103.    If Chris had received prompt medical attention when he became status epilepticus, his life would have been saved.

104.    "Duration of [status epilepticus] is the only potentially modifiable determinant of mortality. With earlier diagnosis as well as prompt initiation and completion of treatment, duration can be directly modified." Jane G. Boggs, *Mortality Associated with Status Epilepticus*, EPILEPSY CURR, Jan. 2004, 4(1) at 25.

105.    When status epilepticus is not treated aggressively within the first hour, the mortality rate increases from 3.7% to 34.8%. *Id.*

106.    "Unfortunately, issues that are highly individual to a given patient, such as transportation, intravenous (IV) access, electroencephalogram (EEG) availability, hemodynamic instability, and airway management can add critical minutes, even hours to the timing of initiation and effectiveness of treatment." *Id.*

107.    At the Gwinnett County Jail, Chris had immediate access to transportation, IV, EEG, and airway management.

108.    The Defendants simply chose not to provide these things.

109.    Instead, Chris's status epilepticus was never treated aggressively in in the over 90 minutes between its onset and Chris's cardiac arrest.

110.    As a result, Chris suffered a slow and painful death.

## II.    The Jail Uniform Policy

111.    Defendants Conway, Woods, Dennis, Casey, and Campbell created, maintained, and enforced a policy, custom, and practice of requiring inmates to be dressed in a Gwinnett County Jail uniform before they could receive medical care.

112.     Accordingly, Defendants Conway, Woods, Dennis, Casey, and Campbell engaged in a custom or policy that resulted in the arbitrary denial of access to medical care for inmates and deliberate indifference to their constitutional rights.

113.     Defendants Conway, Woods, Dennis, Casey, and Campbell directed their subordinates to unlawfully deny inmates access to medical care.

114.     Defendants Conway, Woods, Dennis, Casey, and Campbell were on notice of a history of widespread denial of access to medical care in violation of their constitutional rights that needed correcting and they failed to do so.

115.     At all times relevant to this Complaint, Defendants Conway, Woods, Dennis, Casey, and Campbell knew that it was foreseeable that their subordinates would violate the constitutional rights of inmates such as Chris by denying them access to medical care, and had actual knowledge that their subordinates were in fact denying inmates access to medical care and violating constitutional rights of Chris and other inmates.

116.     Defendants Conway, Woods, Dennis, Casey, and Campbell have directed, condoned, and caused the denial of access to medical care by the jail staff, which resulted in the unreasonable and unconstitutional denial of access to medical care for Chris.

**III.     The Rapid Response Team Use of Force Policy**

117.     At all times relevant to this Complaint, Defendant Conway maintained a Rapid Response Team (the "RRT") that was established to provide a prompt tactical response in the event of a riot or other emergency within the jail. The RRT has since come to be used to exert control over disruptive inmates.

118.     At all times relevant to this Complaint, Defendants Woods and Conway have improperly used the RRT for unconstitutional purposes such as the unreasonable use of force and

the wanton and unnecessary infliction of gratuitous pain against inmates who were deemed uncooperative but did not pose a threat justifying the use of force against them.

119.    At all times relevant to this Complaint, Defendants Woods and Conway have directed the RRT to engage in the systemic use of unreasonable and excessive force against Chris and other inmates, have trained the RRT to use unreasonable and excessive force against Chris and other inmates, have instituted procedures that caused the RRT to systematically use unreasonable and excessive force in violation of the constitutional rights of Chris and other inmates, and have condoned, encouraged and approved such use of unreasonable and excessive force with deliberate indifference to the constitutional rights of Chris and other inmates.

120.    The use of unreasonable and excessive force by the RRT is so frequent, pervasive, and well documented that it rises to the level of a pattern or practice of using excessive force, which is tantamount to an official custom or policy that constitutes said Defendants' actual policy irrespective of what their written policies may state.

121.    For example, the jail's written use of force policy which was adopted or approved by Defendant Conway, or under authority delegated by Conway, states that officers in the jail should "use only that force which is necessary to maintain the security and safety of all persons, staff, and inmates," but it is clear in practice that the jail's actual policy is to tolerate excessive force by the RRT on a routine basis.

122.    The policy requires that the jail administrator review all uses of force in the jail, including planned and unplanned uses of force by the RRT, and that authority was delegated to Woods in his roles as deputy administrator, RRT commander, and/or other supervisory positions. Despite having reviewed hundreds of RRT uses of force, Woods has never found any of them to be in violation of the jail's alleged use of force policy, which indicates that the incidents

involving excessive force were all pursuant to the direction and training provided by Defendants Woods and Conway.

123.    The jail's written use of force policy also states that "no facility employees will strike or lay hands on any inmate except when it is necessary to prevent escape, to prevent injury to other persons and/or damage to property, to quell a disturbance, or as is otherwise necessary in the lawful discharge of their duties," but it is evident on a routine and near daily basis that the RRT is permitted, encouraged, and expected to "lay hands on" or otherwise use force against inmates where there is no justification for the use of force under the law or under the empty words of the policy, indicating that the custom, practice and actual policy of the jail is to give the RRT authority to use unreasonable and excessive force anytime it chooses.

124.    To the extent that the jail's written use of force policy is actually followed rather than ignored, it encourages the RRT to use excessive force because it authorizes officers to use force to "quell a disturbance" without defining what a disturbance is, leading officers to believe that they can use force anytime an inmate makes noise even though the inmate poses no actual threat justifying the use of force under the law.

125.    To the extent that it is followed at all, the written use of force policy is also defective because it leads officers to believe that they can enter a holding cell and use force – thereby injuring an inmate – in order to prevent the inmate from injuring himself or herself, which has been cited on many occasions as the justification for the RRT to enter a holding cell and use force against an inmate who is knocking on the cell door to get the attention of a staff member. The written use of force policy specifically gives officers the authority to use restraints in response to self-harming behavior, and since the use of four-point restraints is a routine component of both planned and unplanned uses of force by the RRT, it is evident in practice that

the RRT equates the alleged justification for restraint with the alleged justification for force since they are routinely applied together. Both the alleged policy as written and the actual policy as applied in practice result in the unreasonable and unnecessary use of force, including prolonged restraint, against inmates including Chris while he was experiencing a seizure.

126. Similarly, the jail's written use of force policy provides that "any staff member who encounters an uncooperative inmate" and is unable to persuade the inmate to cooperate using verbal communications "should never hesitate to summon assistance when necessary," which causes staff members to summon the RRT, which routinely uses excessive force without regard for whether the inmate's perceived lack of cooperation lawfully justifies the level of force used.

127. Defendants' custom, practice and policy as commanders, supervisors and trainers of the RRT is that inmates subjected to the use of force are routinely placed in a restraint chair and continually restrained for a period of approximately four hours without regard for whether the use of force or restraints was justified in the first place, and without regard for whether prolonged continuous restraint is necessary.

128. As commander of the RRT, as the principal trainer for most RRT members, and as a de facto supervisor of the RRT at all times relevant to this Complaint, Defendant Woods has actual knowledge of the fact that the RRT routinely uses unreasonable and excessive force against inmates, and he has in fact trained and directed the RRT to use such force with deliberate indifference to the constitutional rights of Chris and other inmates.

129. As sheriff, Defendant Conway is the final decision-maker and ultimate policymaker of the Gwinnett County Jail, responsible for the oversight, supervision and training of his deputies and detention officers. As sheriff, Defendant Conway has actual knowledge of

the fact that the RRT routinely uses excessive force against inmates, has adopted or approved both formal and informal policies that have caused the RRT to use unreasonable and excessive force against Chris and other inmates, and has tolerated and condoned the use of excessive force by the RRT with deliberate indifference to the constitutional rights of Chris and other inmates.

130. At all times relevant to this Complaint, Defendant Conway knew that it was foreseeable that Defendant Woods and the RRT under his command would violate the constitutional rights of inmates such as Chris by using excessive force against them, and Defendant Conway had actual knowledge that Defendant Woods and the RRT under his command were in fact using excessive force and violating constitutional rights of Chris and other inmates.

131. Defendants Woods and Conway have caused the RRT to use unreasonable and excessive force against Chris and other inmates as demonstrated by the following facts, among others:

a. Defendant Woods reviewed the RRT members' use of force during Chris's medical emergency and stated, "I believe their actions were in line with their training."

b. The RRT conducts itself in the same methodical manner in virtually every incident, which indicates that they are acting in accordance with training and not on a random or ad hoc basis.

c. The RRT members have acted exactly as they were trained to do, and they would have acted differently had they been trained differently.

d. Defendant Conway has ultimate responsibility for making use of force policy for the jail, as well as making sure that the policy is enforced, but video recordings

of RRT uses of force indicate that the jail's alleged written policy has not been enforced because they demonstrate that excessive force is routinely used.

      e.     Every use of force by the RRT has been approved by Defendant Woods as being within policy, which would only be true if the policy was to condone the use of excessive force by the RRT.

      f.     Defendants Woods and Conway have reviewed many RRT videos but have never expressed criticism of the RRT's use of force, even though video evidence clearly shows that excessive force is routinely used.

      g.     Until 2018, Defendants Woods and Conway had never disciplined an officer for excessive force during an RRT action, despite the fact that hundreds of incidents of excessive force had occurred over a period of several years, although at least one RRT member has been removed for complaining about the use of excessive force by another RRT member.

      h.     Defendants Woods and Conway have continued to tolerate, condone, and encourage the use of excessive force by the RRT even after the United States Court of Appeals for the Eleventh Circuit ruled that the RRT's use of force under circumstances such as those alleged by Chris amounts to a federal constitutional violation, and Defendants have made no substantive changes in their policies or practices to bring the RRT's conduct into compliance with that ruling.

132.    Defendants Woods and Conway have directed, condoned, and caused the use of unnecessary and excessive force by the RRT, which resulted in the use of unreasonable and unconstitutional force against Chris.

## PARTIES

133. Plaintiff Robert Howard is a resident of the State of Georgia.

134. Defendant R.L. "Butch" Conway ("Defendant Conway" or "Conway") is, and was at all times relevant to this Complaint, the duly elected Sheriff of Gwinnett County, Georgia.

135. Defendant Captain Frank Woods ("Woods") was at all times relevant to this Complaint the Commander of the jail's Rapid Response Team, and a supervisor acting under the authority or direction of Sheriff Conway who, at all times relevant to this Complaint, had supervisory authority over both the team and its members who were employed by the sheriff as detention officers at the jail.

136. Defendant Dominique Dennis was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. On February 15, 2017, Defendant Dennis was the RRT Squad Leader and was the supervisor responsible for the RRT that responded to Chris's medical emergency. At all times relevant to this Complaint, Defendant Dennis was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

137. Defendant Gregory Ross was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Ross was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

138. Defendant Aaron DeVries was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid

Response Team. At all times relevant to this Complaint, Defendant DeVries was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

139.     Defendant Amber Ashley Thurman was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Thurman was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

140.     Defendant Adam Green was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Green was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

141.     Defendant Philip Hartman was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Hartman was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

142.     Defendant Ilene Nichols was, at all times relevant to this Complaint, a lieutenant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Nichols was an employee or agent of the Gwinnett County

27

Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

143. Defendant Thomas Hayes was, at all times relevant to this Complaint, a captain of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Hayes was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

144. Defendant Martin Campbell was, at all times relevant to this Complaint, a sergeant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Campbell was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

145. Defendant Darius Williams was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Williams was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

146. Defendant Juan Lopez-Razo was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Lopez-Razo was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

28

147. Defendant J.B. Thornton was, at all times relevant to this Complaint, a sergeant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Thornton was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

148. Defendant James Casey was, at all times relevant to this Complaint, a lieutenant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Casey was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

149. Defendant Correct Care Solutions LLC ("CCS") is a company existing under the laws of Tennessee and registered to do business in Georgia. CCS's agent for service of process is Corporate Creations Network Inc. located at 2985 Gordy Parkway, 1st Floor, Marietta, GA, 30066.

150. Defendant Catherine Dillon is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Dillon was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Dillon was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

151. Defendant Myriam Edouard is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Edouard was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Edouard was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

29

152. Defendant Estella Barclay is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Barclay was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Barclay was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

153. Defendant Gwinnett County is duly created and existing political entity under the laws of the state of Georgia that has the capacity to sue and be sued, and is being sued in connection with duties that it owes as a county government. Gwinnett County may be served with process through its Chairman of the Board of Commissioners, Charlotte Nash, 75 Langley Drive, Lawrenceville, GA 30046.

154. Doe Defendants 1 through 5 are individuals working in the Gwinnett County Jail on February 15, 2017 or February 16, 2017 who either (1) participated in the action of placing Chris in Cell 13 rather than JJ Medical; (2) participated in the decision to place Chris in Cell 13 rather than taking him to JJ Medical; or (3) had knowledge of Chris's condition and failed to provide or obtain medical care for Chris. At all times relevant to this Complaint, Doe Defendants 1 through 5 were employees or agents of the Gwinnett County Sheriff's Department, acted within the scope of their employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

155. Doe Defendants 6 through 10 are the individuals not otherwise named in this Complaint who either (1) participated in restraining Chris inside Cell 2 rather than allowing him access to medical care. At all times relevant to this Complaint, Doe Defendants 6 through 10 were employees or agents of the Gwinnett County Sheriff's Department, acted within the scope

of their employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

## JURISDICTION AND VENUE

156. This Court has jurisdiction over each Defendant.

157. This Court has jurisdiction over the subject matter of this action.

158. Venue is proper in Cobb County because one or more of the defendants is a resident of Cobb County.

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, Thornton, Campbell, Williams, Casey, and Does 1 through 10 Based Upon Deliberate Indifference to Serious Medical Needs**

159. Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

160. Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, Thornton, Campbell, Williams, Casey, and Does 1 through 10 (collectively the "Count I Defendants"), acting under color of state law, were responsible for providing Chris access to medical care.

161. While in the custody and care of the Count I Defendants, Chris had serious, life-threatening medical needs.

162. A lay person would recognize the necessity for a doctor's attention for someone in Chris's condition as described above.

163. Chris's medical condition was diagnosed by Dr. Hashmi as mandating treatment.

164. A delay in treating a prolonged seizure worsens the condition.

165. The Count I Defendants had actual knowledge of Chris's serious medical needs.

166. The Count I Defendants were deliberately indifferent to Chris's serious medical needs in at least the following ways:

      a.     The Count I Defendants refused to call 911 or otherwise obtain emergency medical treatment for Chris;

      b.     The Count I Defendants refused to take Chris to JJ Medical despite express instructions for medical personnel to do so and, instead, placed Chris in cell 13 for over 40 minutes;

      c.     The Count I Defendants knew that Chris has been placed in Cell 13 despite needing emergency medical care for serious medical needs and took no action to provide him access to medical care;

      d.     The Count I Defendants denied Chris access to medical personnel qualified to treat his serious medical needs;

      e.     The Count I Defendants failed to inquire into the essential facts that were necessary to make a professional judgment about Chris's serious medical needs;

      f.     The Count I Defendants caused factors unrelated to inmates' medical needs to interfere with the exercise of medical judgment regarding Chris's serious medical needs;

      g.     The Count I Defendants failed to carry out medical orders pertaining to Chris's serious medical needs; and

      h.     The Count I Defendants used unreasonable and excessive force to restrain Chris which both worsened his medical condition and prevented others from providing him medical care.

167.    The Count I Defendants' knowledge of Chris's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

168.    The Count I Defendants' failure to allow Chris access to medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

169.    Accordingly, the Count I Defendants' deliberate indifference to Chris's serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourth and Fourteenth Amendments.

170.    As a direct and proximate result of the Count I Defendants' deliberate indifference to Chris's serious medical needs, Chris experienced conscious pain and suffering and died.

## Count II

**42 U.S.C. § 1983: Supervisory Liability for Deliberate Indifference to Serious Medical Needs in Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Campbell, Casey, and Conway**

171.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

172.    Defendants Conway, Dennis, Casey, and Campbell (collectively the "Count II Defendants") have supervisory liability under 42 U.S.C. § 1983 for the violation of Chris's constitutional rights because the Count II Defendants implemented, maintained, and enforced a policy or custom requiring jail inmates to be dressed in a jail uniform before being allowed access to medical care.

173.    The Count II Defendants had actual knowledge that their policy or custom caused medical care for inmates to be denied or delayed and nonetheless continued to maintain and enforce the policy or custom.

174.    The Count II Defendants' jail uniform policy or custom constitutes deliberate

indifference to Chris's serious medical needs.

175.    As a direct result of the policy or custom of denying access to medical care until

inmates are dressed in a jail uniform, Chris was denied access to medical care while suffering a

life-threatening medical emergency.

176.    As a result of that denial of medical care caused by the Count II Defendants'

policy or custom, Chris experienced conscious pain and suffering and died.

## Count III

### 42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dillon, Edouard, and Barclay Based Upon Deliberate Indifference to Serious Medical Needs

177.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated

herein.

178.    Defendants Dillon, Edouard, and Barclay (collectively the "Count III

Defendants"), acting under color of state law, were responsible for providing medical care to

Chris.

179.    While in the custody and care of the Count III Defendants, Chris had serious, life-

threatening medical needs.

180.    A lay person would recognize the necessity for a doctor's attention when someone

experiences a prolonged seizure.

181.    Chris's medical condition was diagnosed by Dr. Hashmi as mandating treatment.

182.    A delay in treating a prolonged seizure worsens the condition.

183.    The Count III Defendants had actual knowledge of Chris's serious medical needs.

184.    The Count III Defendants were deliberately indifferent to Chris's serious medical

needs in at least the following ways:

a.      The Count III Defendants refused to call 911 or otherwise obtain emergency medical treatment for Chris;

b.      The Count III Defendants did not provide any medical treatment for Chris's seizure for over 12 minutes.

c.      The Count III Defendants denied Chris access to medical personnel qualified to treat his serious medical needs;

d.      The Count III Defendants failed to inquire into the essential facts that were necessary to make a professional judgment about Chris's serious medical needs;

e.      The Count III Defendants caused factors unrelated to inmates' medical needs to interfere with the exercise of medical judgment regarding Chris's serious medical needs; and

f.      The Count III Defendants failed to carry out medical orders pertaining to Chris's serious medical needs.

185.      The Count III Defendants' knowledge of Chris's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

186.      The Count III Defendants' failure to allow Chris access to medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

187.      Accordingly, the Count III Defendants' deliberate indifference to Chris' serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourth and Fourteenth Amendments.

188.    As a direct and proximate result of the Count III Defendants' deliberate indifference to Chris's serious medical needs, Chris experienced conscious pain and suffering and died.

## Count IV

### 42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman Based Upon Excessive Use of Force

189.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

190.    Chris had a Fourteenth Amendment right to be free from the use of excessive force, and the Fourth Amendment requires that any force used against a pretrial detainee be objectively reasonable under the totality of the circumstances.

191.    There was no factual or legal justification for Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman (collectively the "Count IV Defendants") to use the force described in this Complaint against Chris.

192.    Chris was subjected to the use of excessive force in violation of the Fourth Amendment because the force used against him was not objectively reasonable, was not necessary to maintain or restore discipline, and was gratuitous, unnecessary, and entirely punitive.

193.    The excessive force used by the Count IV Defendants both worsened Chris's medical emergency and prevented medical personnel from providing medical care to Chris.

194.    Accordingly, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman are liable for violating Chris's Fourth and Fourteenth Amendment rights.

195.     As a direct result of the Count IV Defendants' use of excessive force in violation of Chris's Fourth and Fourteenth Amendment rights, Chris experienced conscious pain and suffering and died.

### Count V

**42 U.S.C. § 1983: Supervisory Liability for Excessive Force in Violation of the Fourth and Fourteenth Amendments by Defendants Woods and Conway**

196.     Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

197.     Chris had a Fourteenth Amendment right to be free from the use of excessive force, and the Fourth Amendment requires that any force used against a pretrial detainee be objectively reasonable under the totality of the circumstances.

198.     There was no factual or legal justification for the use excessive force against Chris described in this Complaint

199.     Defendants Woods and Conway have supervisory liability under 42 U.S.C. §1983 for the violation of Chris's constitutional rights because (1) Woods and Conway engaged in customs or policies that caused use of excessive force against Chris in violation of his constitutional rights; (2) Woods and Conway directed, encouraged, and caused the use of unreasonable and excessive force against Chris in violation of his constitutional rights; or (3) Woods and Conway's deliberate indifference to the constitutional rights of Chris and other inmates proximately caused the use of such unreasonable and excessive force against Chris.

200.     Accordingly, Defendants Woods and Conway are liable for violating Chris's Fourth and Fourteenth Amendment rights and as a direct result of those constitutional violations Chris experienced conscious pain and suffering and died.

## Count VI

**42 U.S.C. § 1983: County Liability for Violation of the Fourth and Fourteenth Amendments by Defendants Correct Care Solutions LLC and Gwinnett County**

201. Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

202. As described above, the conduct of Defendants Dillon, Edouard, and Barclay constituted deliberate indifference to Chris's serious medical needs in violation of his constitutional rights.

203. At all relevant times, Defendant Correct Care Solutions LLC was the policymaker and final decision-maker with respect to the medical care of inmates in the Gwinnett County Jail under authority delegated by the county, which has a statutory duty to provide such care under Georgia law.

204. At all relevant times, Defendant Correct Care Solutions LLC was the final repository of county authority with respect to the medical care of inmates in the jail, by virtue of authority delegated to Correct Care Solutions LLC and its agents or employees both contractually and by virtue of the custom of the county to defer to Correct Care Solutions, LLC with respect to all medical decisions, policies, and treatment protocols impacting inmates in the jail.

205. In its capacity as policymaker and final decision-maker with respect to the medical care of inmates in the Gwinnett County Jail, Defendant Correct Care Solutions LLC and its agents or employees were deliberately indifferent to the serious medical needs of Chris, and the deliberate indifference was tantamount to official county policy.

206. The acts and omissions of deliberate indifference by Correct Care Solutions LLC and its agents or employees constituted final decisions by the county's policy-maker and final

decision-maker with respect to inmate medical care for which the county is liable. Alternatively, the deliberate indifference of all the Defendants resulted from official customs and policies of Correct Care Solutions LLC (and thus Gwinnett County) that were the moving force behind the violation of Chris's constitutional rights. Either way, Chris's constitutional rights were violated by Correct Care Solutions LLC as the policymaker and final decision-maker for jail medical care.

207. By virtue of having delegated exclusive authority to Correct Care Solutions LLC for policymaking and final decision-making with respect to the provision of inmate medical care, Gwinnett County is liable for the Correct Care Solutions LLC policies and decisions that caused Chris's rights to be violated.

208. Gwinnett County and Correct Care Solutions LLC did not have adequate policies regarding provision of outside emergency medical care to inmates suffering medical emergencies. The County and Correct Care Solutions LLC did not have adequate policies regarding the medical personnel's authority or ability to get inmates access to medical care, particularly if non-medical personnel were hindering such access to medical care. To the extent that such policies existed they were unconstitutionally applied in this case. Either way, such policies were defective and a moving force behind the violation of Chris's constitutional rights because they caused both detention and medical personnel to be deliberately indifferent to his serious medical needs in reliance upon such policies, for which both Gwinnett County and Correct Care Solutions LLC are liable.

209. Chris's suffering and death was proximately caused by the above-described deliberate indifference of all the Defendants, which represented the official policy of the Gwinnett County Jail for which Gwinnett County and Correct Care Solutions LLC are liable

under Section 1983 for causing Chris to be deprived of his rights under the Fourth and
Fourteenth Amendments.

## Count VII

### Negligence and Professional Malpractice by Defendants Correct Care Solutions LLC, Dillon, Edouard, and Barclay

210.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully
stated herein.

211.    Defendants Correct Care Solutions LLC, Dillon, Edouard, and Barclay owed
Chris a duty to exercise the degree of care and skill ordinarily possessed and exercised by
physicians, nurses and other medical professionals under like conditions and similar
circumstances.

212.    Defendants Correct Care Solutions LLC, Dillon, Edouard, and Barclay violated
the standard of care in at least the following ways:

    a.    Failing to call 911 or otherwise obtain emergency medical help after
learning that Chris's seizure was prolonged;

    b.    Failing to provide any treatment for Chris's seizure for approximately 12
minutes; and

    c.    Failing to provide or obtain appropriate treatment for Chris's condition at
any point from its inception until emergency medical personnel were called.

213.    The affidavit of Sherrie Thomas, R.N. is attached as Exhibit 1 and incorporated
by reference.

214.    Defendant Correct Care Solutions LLC is vicariously liable for the negligence of
Defendants Dillon, Edouard, and Barclay.

215. Defendant Correct Care Solutions LLC was additionally negligent in at least the following ways:

      a.     Failing to provide reasonable training to the jail medical personnel;

      b.     Failing to provide adequate medical staff for the jail;

      c.     Hiring personnel who were not appropriately qualified for their positions; and

      d.     Failing to provide reasonable supervision of its employees at the jail.

216. As a direct and proximate result of Defendants Correct Care Solutions LLC, Dillon, Edouard, and Barclay's negligence, Chris experienced pain and suffering, and died.

## DAMAGES

217. As a direct and proximate result of the conduct of the Defendants described in this Complaint, Chris suffered bodily injuries and death.

218. Plaintiff Robert Howard is entitled to recover for the full value of the life of Christopher Howard as determined by a jury.

219. The Estate of Christopher Howard is entitled to recover for Chris's conscious pain and suffering, medical expenses, burial expenses, and all other damages which may be authorized by law.

220. Because the conduct of Defendants was malicious, intentional, and carried out in bad faith, and because Defendants acted with deliberate indifference and conscious indifference to constitutional rights, Plaintiff is entitled to recover punitive damages against all Defendants except for the county to the extent it may be exempt by law from punitive damage awards.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court award the following relief from Defendants:

a.    An award of compensatory damages in an amount to be proven at trial, including interest;

b.    An award of punitive damages in favor of Plaintiff against all Defendants except for Gwinnett County;

c.    Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988, O.C.G.A. § 13-6-11, or other applicable law; and

d.    Such other and further relief as the Court may deem just and proper.

Dated:  January 4, 2019.

/s/Eric S. Fredrickson
Matthew S. Harman
Georgia Bar No. 327169
Eric Fredrickson
Georgia Bar No. 489783

HARMAN LAW FIRM LLC
3575 Piedmont Road
Building 15, Suite 1040
Atlanta, Georgia 30305
Phone: (404) 554-0777
Fax:    (404) 424-9370
Email: mharman@harmanlaw.com
        efredrickson@harmanlaw.com

*Attorneys for Plaintiff*

**≋ EFILED IN OFFICE**
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 04, 2019 01:54 PM**

*Angie J. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

# EXHIBIT 1

STATE OF TENNESSEE

COUNTY OF RUTHERFORD

### AFFIDAVIT OF SHERRIE L. THOMAS, R.N.

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, Sherrie L. Thomas, R.N., who after being duly sworn, deposes and states as follows:

1. I am Sherrie L. Thomas. I am over the age of majority and suffer from no mental or physical disability which prevents me from giving this Affidavit.

2. This affidavit is based on my own personal knowledge, medical records pertaining to Christopher Howard, video from Gwinnett County Jail, and my education, training, and experience.

3. I am a licensed registered nurse in the state of Tennessee. In 2005 I received a Licensed Practical Nursing Diploma from Tennessee Technology Center. I have worked as a nurse continually since 2005. From 2005 to 2015, I worked as a nurse for the Rutherford County Sheriff's Office. From 2015 to the present, I have worked as a nurse at Trustpoint Hospital. A copy of my curriculum vitae is attached as Exhibit A and incorporated herein by reference.

4. I am aware that this Affidavit is being used in support of certain allegations of professional negligence alleged against the below referenced nurses, and those for whom they may have been an employee or agent.

5. Based upon my education, training, and experience, I am familiar with, have personal knowledge of, and am qualified to testify as to the applicable standard of care exercised by nurses generally ("the standard of care") in the care and treatment of patients such as Christopher Howard. In particular, I am familiar with the standard of care applicable to nurses in the care and treatment of patients, such as Christopher Howard, who suffer seizures while in the custody of a correctional facility.

6. I have reviewed medical records from Gwinnett County Jail, video from Gwinnett County Jail, and medical records from Gwinnett Medical Center. Based upon my education, training, and experience, as well as my review of the above-referenced materials, I make the following observations:

    a. On February 15, 2017, Christopher Howard suffered a seizure while in an admissions cell at Gwinnett County Jail.

    b. Nurses Catherine Dillon, Estella Barclay, and Myrium Edouard responded to the cell.

    c. After approximately 12 minutes, Nurse Edouard administered a one millilitre injection of Ativan, an anti-seizure medication.

    d. The seizure continued for over 16 minutes in total.

    e. The nursing staff did not call 911 or otherwise attempt to obtain emergency medical services from outside the facility.

7. In my professional opinion, the standard of care requires nurses to call for emergency medical services as soon as possible when a patient experiences a seizure lasting longer than approximately five minutes.

8. In my professional opinion, the nurses responsible, including the nurses discussed above. deviated from the standard of care and skill exercised by nurses generally under the same conditions and like surrounding circumstances.

9. I give this Affidavit pursuant to O.C.G.A. § 9-11-9.1 for the purpose of setting forth at least one negligent act or omission in the medical care of Christopher Howard and to demonstrate that this is a bona fide claim. This Affidavit is not intended to, nor do I understand that it must, set out all of the opinions that I hold or that I may hold in this matter. especially after further investigation. I reserve the right to amend or alter these opinions should further investigation require me to do so.

This ___14th___ day of December, 2018.

_____Sherrie L. Thomas_____
SHERRIE L. THOMAS

Sworn to and subscribed before me
This __14__ day of December, 2018.

_____
Notary Public

My commission expires: 22 May 2022

2

**EFILED IN OFFICE**
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

**CASE NO.: 19-A-41**

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
R.L. "Butch" Conway
2915 Cammie Wages Road
Dacula, GA 30019

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

*****************************************************************************

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below.*

**XXXXX** INDIVIDUAL - I have this day the **_12^th of January 2019 @4:02pm_** personally served the **_Defendant R.L. "BUTCH" CONWAY_** at **_2915 Cammie Wages Road, Dacula, GA 30019_** with a copy of the writs and tendered the applicable witness fee of $**_N/A_**.

_____ CORPORATE - Served the Corporation: at by leaving a copy of the writs with: in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

_____ POSTED – By posting a copy to the door of the premises on and depositing a copy in the U.S. Mail, First Class in an envelope properly addressed with adequate postage thereon and said containing notice of the Witness to answer at the place stated in said Subpoena.

Sworn to and subscribed to me on this ___17___ day of ___January___ 2018.

Notary Public
My Commission Expires: ___12-12-2019___

Process Server: Hassan M. Rashid
LEGAL UNLIMITED, INC.
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

**IN THE STATE COURT OF COBB COUNTY**

COBB COUNTY, GA
CLERK OFFICE

2019 JAN -8 PM 3: 51

STATE COURT CLERK-07

**STATE OF GEORGIA**

IN RE:                                    CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

## ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until _Dec. 31_ , 20_19_

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this _7th_ day of _Jan_ , 2019.

_AllisonBannister_

**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 18, 2019 10:03 AM

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41
Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Ilene Nichols
838 Kirsten Jane Court
Lawrenceville, GA 30045

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳✳

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid**
who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age
or older and a party having no interest in this action. Affiant further states that this writ was served as indicated
*below*.

**XXXXX**    INDIVIDUAL - I have this day the *12ᵗʰ of January 2019 @6:19pm* personally served the
***Defendant ILENE NICHOLS*** at ***838 Kirsten Jane Court, Lawrenceville, GA 30045*** with a copy of the writs
and tendered the applicable witness fee of $*N/A*.


_____    CORPORATE - Served the Corporation:  at  by leaving a copy of the writs with:  in charge of
the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered
the applicable witness fee of N/A.


_____    POSTED – By posting a copy to the door of the premises on and depositing a copy in the U.S.
Mail, First Class  in an envelope properly addressed with adequate postage thereon and said containing
notice of the Witness to answer at the place stated in said Subpoena.

Sworn to and subscribed to me on this 17 day of January 2018.

Notary Public                                          Process Server: **Hassan M. Rashid**
My Commission Expires: 10-02-2019            **LEGAL UNLIMITED, INC.**
                                                       **1750 Peachtree Street NW**
                                                       **Atlanta, GA 30309**
                                                       **(404) 408-5900**

**IN THE STATE COURT OF COBB COUNTY**

**STATE OF GEORGIA**

IN RE:

CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

**ORDER**

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___Dec. 31___, 20_19_.

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___7th___ day of ___Jan___, 2019.

_AllisonBamesHall_

**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie S. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41
Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Philip Hartman
231 Oceanliner Drive
Winder, GA 30680

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

Personally appeared before me, the undersigned officer duly authorized to administer oaths: <u>Hassan M.Rashid</u> who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below*.

**XXXXX**    INDIVIDUAL - I have this day the <u>*13th*</u> *of January 2019 @5:25pm* personally served the *Defendant PHILIP HARTMAN* at *231 Oceanliner Drive, Winder, GA 30680* with a copy of the writs and tendered the applicable witness fee of $<u>*N/A*</u>.

_____    CORPORATE - Served the Corporation:   at   by leaving a copy of the writs with:   in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

_____    POSTED – By posting a copy to the door of the premises on and depositing a copy in the U.S. Mail, First Class in an envelope properly addressed with adequate postage thereon and said containing notice of the Witness to answer at the place stated in said Subpoena.

Sworn to and subscribed to me on this 17 day of January 2019.

_____
Notary Public
My Commission Expires: 10-12-2019



Process Server: Hassan M. Rashid
**LEGAL UNLIMITED, INC.**
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

## IN THE STATE COURT OF COBB COUNTY
## STATE OF GEORGIA

IN RE:

CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___Dec. 31___, 20_19_.

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___7th___ day of ___Jan___, 2019.

_Allison Barnes Baller_

**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 18, 2019 10:03 AM

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
    ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Myriam Edouard
418 Berckman Drive NW
Lilburn, GA 30047

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※※

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below.*

**XXXXX**    INDIVIDUAL - I have this day the **_14th of January 2019 @7:38pm_** personally served the **_Defendant MYRIAM EDOUARD_** at **_418 Berckman Drive NW, Lilburn GA 30047_** with a copy of the writs and tendered the applicable witness fee of $**_N/A_**.

_____    CORPORATE - Served the Corporation:  at  by leaving a copy of the writs with:  in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

_____    POSTED – By posting a copy to the door of the premises on and depositing a copy in the U.S. Mail, First Class in an envelope properly addressed with adequate postage thereon and said containing notice of the Witness to answer at the place stated in said Subpoena.

Sworn to and subscribed to me on this __17__ day of __January__ ~~2018~~ 2019.

Notary Public
My Commission Expires: __10-12-2019__

Process Server: Hassan M. Rashid
**LEGAL UNLIMITED, INC.**
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

# IN THE STATE COURT OF COBB COUNTY

## STATE OF GEORGIA

IN RE:                                          CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___Dec. 31___, 20_19_

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this __7th__ day of __Jan__, 2019.

_AllisonBannesHaller_
**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 18, 2019 10:03 AM

Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
SUMMONS/COMPLAINT/EXHIBIT 1.

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Juan Lopez Razo
2030 Lake Ford Circle
Duluth, GA 30096

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below*.

**XXXXX**    INDIVIDUAL - I have this day the *14th of January 2019 @8:22pm* personally served the *Defendant JUAN LOPEZ-RAZO* at *2030 Lake Ford Circle, Duluth GA 30096* with a copy of the writs and tendered the applicable witness fee of $*N/A*.

_____    CORPORATE - Served the Corporation: at by leaving a copy of the writs with: in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

_____    POSTED — By posting a copy to the door of the premises on and depositing a copy in the U.S. Mail, First Class in an envelope properly addressed with adequate postage thereon and said containing notice of the Witness to answer at the place stated in said Subpoena.

Sworn to and subscribed to me on this ⎵17⎵ day of ⎵January⎵ 2019.

Notary Public
My Commission Expires: ⎵10-12-2019⎵

Process Server: **Hassan M. Rashid**
**LEGAL UNLIMITED, INC.**
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

**IN THE STATE COURT OF COBB COUNTY**

COBB COUNTY, GA
STATE COURT OFFICE

2019 JAN -8 PM 3: 51

STATE COURT CLERK-07

**STATE OF GEORGIA**

IN RE:                                        CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ____Dec. 31____, 20_19_

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this __7th__ day of __Jan__, 2019.

_Allison Bames hall_

**JUDGE**
**STATE COURT OF COBB COUNTY**

**EFILED IN OFFICE**
CLERK OF STATE COURT
COBB COUNTY, GEORGIA
**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41
Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
SUMMONS/COMPLAINT/EXHIBIT 1.

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Aaron Devries
1140 Otis Drive
Bethlehem, GA 30620

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below*.

_____ INDIVIDUAL - I have this day the personally served the  at  with a copy of the writs and tendered the applicable witness fee of $.

_____ CORPORATE - Served the Corporation:  at  by leaving a copy of the writs with:  in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

**XXXXX** SUBSTITUTE — I have this day the *12th of January 2019 @4:48pm* served the *Defendant AARON DEVRIES* at *1140 Otis Drive, Bethlehem, GA 30620* by leaving a copy of the writs with *Jennifer Devries, Spouse/co-resident* who is authorized to accept on his behalf and tendered the applicable witness fee of $N/A.

Sworn to and subscribed to me on this ___ day of _____ 2019.

Notary Public
My Commission Expires: _____

Process Server: Hassan M. Rashid
**LEGAL UNLIMITED, INC.**
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

# IN THE STATE COURT OF COBB COUNTY

COBB COUNTY, GA
STATE COURT OFFICE
2019 JAN -8 PH 3: 51
STATE COURT CLERK-07

## STATE OF GEORGIA

IN RE:

CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until _Dec. 31_____, 20_19_

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this _7th_ day of _Jan_____, 2019.

_AllisonBarnesball_
**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 18, 2019 10:03 AM

*Angie T. Davis, Clerk of State Court*
*Cobb County, Georgia*

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
### AFFIDAVIT OF SERVICE

**CASE NO.: 19-A-41**

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served:*
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Darius Williams
779 Johnson Road
Jonesboro, GA 30236

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

Personally appeared before me, the undersigned officer duly authorized to administer oaths: Hassan M.Rashid who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below.*

_____ INDIVIDUAL - I have this day the personally served the   at   with a copy of the writs and tendered the applicable witness fee of $.

_____ CORPORATE - Served the Corporation: at   by leaving a copy of the writs with:   in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

***XXXXX*** SUBSTITUTE – I have this day the *13th of January 2019 @8:45pm* served the *Defendant DARIUS WILLIAMS* at *779 Johnson Road, Jonesboro GA 30236* by leaving a copy of the writs with *Beverly Williams, Mother/co-resident* who is authorized to accept on his behalf and tendered the applicable witness fee of $N/A.

Sworn to and subscribed to me on this 17 day of January 2019.

_____
Notary Public
My Commission Expires: 10-12-2019

Process Server: Hassan M. Rashid
LEGAL UNLIMITED, INC.
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

# IN THE STATE COURT OF COBB COUNTY

## STATE OF GEORGIA

IN RE:

CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___Dec. 31___, 20_19_.

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___7th___ day of ___Jan___, 2019.

_Allison Bannerhall_

**JUDGE**
**STATE COURT OF COBB COUNTY**

⬧ EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie T. Davis*
Angela T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

**CASE NO.: 19-A-41**

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Amber Ashley Thurman
1201 Dale Drive
Monroe, GA 30656

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below*.

_____ INDIVIDUAL - I have this day the personally served the   at   with a copy of the writs and tendered the applicable witness fee of $.

_____ CORPORATE - Served the Corporation:   at   by leaving a copy of the writs with:   in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

**XXXXX** SUBSTITUTE – I have this day the _**12th**_ _**of January 2019 @5:15pm**_ served the _**Defendant AMBER ASHLEY THURMAN**_ at _**1201 Dale Drive, Monroe GA 30656**_ by leaving a copy of the writs with _**Mr. Thurman, relative/co-resident**_ who is authorized to accept on her behalf and tendered the applicable witness fee of $N/A.

Sworn to and subscribed to me on this \_\_17\_\_ day of \_\_January\_\_ 2019.

_____
Notary Public
My Commission Expires: \_10 - 12 - 2019\_

Process Server: Hassan M. Rashid
**LEGAL UNLIMITED, INC.**
**1750 Peachtree Street NW**
**Atlanta, GA 30309**
**(404) 408-5900**

**IN THE STATE COURT OF COBB COUNTY**

**STATE OF GEORGIA**

COBB COUNTY, GA
CLERK'S OFFICE

2019 JAN -8 PM 3: 51

STATE COURT CLERK-07

IN RE:                                         CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___Dec. 31___, 20_19_.

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___7th___ day of ___Jan___, 2019.

_Allison Baumstark_
**JUDGE**
**STATE COURT OF COBB COUNTY**

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie T. Davis, Clerk of State Court*
*Cobb County, Georgia*

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41

Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served:*
**SUMMONS/COMPLAINT/EXHIBIT 1.**

Attorney:

Matthew Harman, Esq.

3575 Piedmont Road NE

Building 15, Suite 1040

Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:

Correct Care Solutions LLC

c/o Corporate Creations Network Inc., R.A.

2985 Gordy Parkway, 1st Floor

Marietta, GA 30066

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M. Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below.*

_____ INDIVIDUAL - I have this day the personally served the  at  with a copy of the writs and tendered the applicable witness fee of $.

**XXXXX** CORPORATE - Served the Corporation: ***CORRECT CARE SOLUTIONS on the 8th day of January 2019 @4:30pm*** at ***2985 Gordy Parkway, 1st Floor, Marietta GA 30066*** by leaving a copy of the writs with: ***Elisha Tillman, Process Specialist*** in charge of the office and place of doing business of said Corporation in Cobb County, Georgia, and tendered the applicable witness fee of N/A.

_____ SUBSTITUTE – I have this day the served the  at  by leaving a copy of the writs with  who is authorized to accept on her behalf and tendered the applicable witness fee of $N/A.

Sworn to and subscribed to me on this _17_ day of _January_ 2019.

_____
Notary Public
My Commission Expires: _10-12-2019_

Process Server: Hassan M. Rashid
LEGAL UNLIMITED, INC.
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

# IN THE STATE COURT OF COBB COUNTY
## STATE OF GEORGIA

IN RE:                                    CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

## ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until _____Dec. 31_____, 20_19_.

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___7th___ day of ___Jan_____, 2019.

_AllisonBarnesFaller_____
JUDGE
STATE COURT OF COBB COUNTY

✔ EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 18, 2019 10:03 AM**

*Angie J. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## STATE OF GEORGIA
## STATE COURT OF COBB COUNTY
## AFFIDAVIT OF SERVICE

CASE NO.: 19-A-41
Date Received: 1.04.19.

*DOCUMENT(s)/Writ(s) Served*:
SUMMONS/COMPLAINT/EXHIBIT 1.

Attorney:
Matthew Harman, Esq.
3575 Piedmont Road NE
Building 15, Suite 1040
Atlanta, GA 30305

Plaintiff(s):
ROBERT HOWARD, et.al.,

v.

Name and Address of Party To Be Served:
Gwinnett County
Chairman of the Board of Commissioners
Charlotte Nash
75 Langley Drive
Lawrenceville, GA 30046

Respondent(s):
R.L. "BUTCH" CONWAY; GWINNETT COUNTY;
et.al.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Personally appeared before me, the undersigned officer duly authorized to administer oaths: **Hassan M.Rashid** who first being duly sworn on oaths deposes and states that he is a citizen of the United States and 21 years of age or older and a party having no interest in this action. Affiant further states that this writ was served as indicated *below*.

_____ INDIVIDUAL - I have this day the personally served the   at   with a copy of the writs and tendered the applicable witness fee of $.

**XXXXX** CORPORATE - Served the Corporation: **_GWINNETT COUNTY on the 9th day of January 2019_** **_@3:05pm_** at **_75 Langley Drive, Lawrenceville GA 30046_** by leaving a copy of the writs with: **_Julie B. Mims, Legal Manager_** in charge of the office and place of doing business of said Corporation in Gwinnett County, Georgia, and tendered the applicable witness fee of N/A.

_____ SUBSTITUTE – I have this day the served the   at   by leaving a copy of the writs with   who is authorized to accept on her behalf and tendered the applicable witness fee of $N/A.

Sworn to and subscribed to me on this _1 7_ day of _January_ 2019.

_____
Notary Public
My Commission Expires: _10-12-2019_



Process Server: Hassan M. Rashid
**LEGAL UNLIMITED, INC.**
1750 Peachtree Street NW
Atlanta, GA 30309
(404) 408-5900

**IN THE STATE COURT OF COBB COUNTY**

**STATE OF GEORGIA**

IN RE:

CIVIL ACTION NO: _____

PETITION OF HASSAN M. RASHID,

FOR PERMANENT PROCESS SERVER

### ORDER

It appearing to the Court that Petitioner is a citizen of the United States over 21 years of age and is otherwise qualified, the Court hereby appoints Hassan M. Rashid, as a permanent process server under O.C.G.A. Section 9-11-4(c) until ___*Dec. 31*___, 20*19*

Pursuant to this Order, Petitioner may be used by an attorney or party as a process server in a particular case. Upon service of process in that particular case, Petitioner shall cause a copy of his petition to serve as a process server, and a copy of this Order Of appointment to be filed with the Clerk of the Court along with the return of service executed in the particular case.

The process server under this Order is not to serve parties on a case in which he has an interest.

SO ORDERED, this ___*7th*___ day of ___*Jan*___, 2019.

_____
**JUDGE**
**STATE COURT OF COBB COUNTY**

🍎 **EFILED IN OFFICE**
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 22, 2019 11:36 AM**

*Angie T. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

ROBERT HOWARD, individually and as
Administrator of the ESTATE OF
CHRISTOPHER HOWARD,

      Plaintiff,

        v.

R.L. "BUTCH" CONWAY; GWINNETT
COUNTY; CORRECT CARE
SOLUTIONS LLC; FRANK WOODS;
DOMINIQUE DENNIS; GREGORY
ROSS; AARON DEVRIES; AMBER
ASHLEY THURMAN; ADAM GREEN;
PHILIP HARTMAN; ILENE NICHOLS;
THOMAS HAYES; MARTIN
CAMPBELL; DARIUS WILLIAMS; JUAN
LOPEZ-RAZO; JAMES THORNTON;
JAMES CASEY; CATHERINE DILLON;
MYRIAM EDOUARD; ESTELLA
BARCLAY; AND DOES 1–10,

      Defendants.

Civil Action No. 19-A-41

**Jury Trial Demanded**

## ACKNOWLEDGMENT OF SERVICE

      Pursuant to O.C.G.A. § 9-10-73, Defendants Frank Woods, Dominique Dennis, Gregory

Ross, Adam Green, Thomas Hayes, Martin Campbell, James Thornton, and James Casey hereby

acknowledge receipt and service of the Summons and Complaint filed by Plaintiff Robert Howard,

individually and as Administrator of the Estate of Christopher Howard in the above-styled action.

I certify that I am authorized to acknowledge receipt and service of the Summons and Complaint

on behalf of Defendants Frank Woods, Dominique Dennis, Gregory Ross, Adam Green, Thomas

Hayes, Martin Campbell, James Thornton and James Casey and Defendants Frank Woods,

Dominique Dennis, Gregory Ross, Adam Green, Thomas Hayes, Martin Campbell, James

Thornton and James Casey waive all further notice, service, or issuance of process in this action.

This 22nd day of January, 2019.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*
Richard A. Carothers
Georgia Bar No. 111075
Thomas M. Mitchell
Georgia Bar No. 513597
Angela C. Couch
Georgia Bar No. 190005
Attorneys for Defendants Conway, Gwinnett
County, Woods, Dennis, Ross, DeVries, Thurman,
Green, Hartman, Nichols, Hayes, Campbell,
Williams, Lopez-Razo, Thornton, and Casey

1809 Buford Highway
Buford, Georgia 30518
(770) 932-3552
richard.carothers@carmitch.com
thomas.mitchell@carmitch.com
angela.couch@carmitch.com

## CERTIFICATE OF SERVICE

This shall certify that a true and correct copy of the foregoing was this day served upon all counsel of record in this matter using the Court's Electronic Filing System, which will automatically send notice of such filing to all counsel of record.

This 22nd day of January, 2019.

CAROTHERS & MITCHELL, LLC

*/s/ Angela C. Couch*
Richard A. Carothers
Georgia Bar No. 111075
Thomas M. Mitchell
Georgia Bar No. 513597
Angela C. Couch
Georgia Bar No. 190005
Attorneys for Defendants Conway, Gwinnett
County, Woods, Dennis, Ross, DeVries, Thurman,
Green, Hartman, Nichols, Hayes, Campbell,
Williams, Lopez-Razo, Thornton, and Casey

1809 Buford Highway
Buford, Georgia 30518
(770) 932-3552
richard.carothers@carmitch.com
thomas.mitchell@carmitch.com
angela.couch@carmitch.com

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

JAN 24, 2019 06:04 PM

*Angie J. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

## IN THE STATE COURT OF COBB COUNTY
## STATE OF GEORGIA

ROBERT HOWARD, individually and as
Administrator of the ESTATE OF
CHRISTOPHER HOWARD,

        Plaintiff,

        v.

R.L. "BUTCH" CONWAY; GWINNETT
COUNTY; CORRECT CARE
SOLUTIONS LLC; CORRECT CARE
SOLUTIONS GROUP HOLDINGS, LLC
d/b/a WELLPATH; FRANK WOODS;
DOMINIQUE DENNIS; GREGORY
ROSS; AARON DEVRIES; AMBER
ASHLEY THURMAN; ADAM GREEN;
PHILIP HARTMAN; ILENE NICHOLS;
THOMAS HAYES; MARTIN
CAMPBELL; DARIUS WILLIAMS; JUAN
LOPEZ-RAZO; JAMES THORNTON;
JAMES CASEY; CATHERINE DILLON;
MYRIAM EDOUARD; ESTELLA
BARCLAY; AND DOES 1–10,

        Defendants.

Civil Action No. 19-A-41

**Jury Trial Demanded**

## FIRST AMENDED COMPLAINT

Robert Howard, individually and as Administrator of the Estate of Christopher Howard

brings this action against defendants R.L. "Butch" Conway; Gwinnett County; Correct Care

Solutions LLC; Correct Care Solutions Group Holdings, LLC d/b/a Wellpath; Frank Woods;

Dominique Dennis; Gregory Ross; Aaron DeVries; Amber Ashley Thurman; Adam Green;

Philip Hartman; Ilene Nichols; Thomas Hayes; Martin Campbell; Darius Williams; Juan Lopez-

Razo; James Thornton; James Casey; Catherine Dillon; Myriam Edouard; and Estella Barclay

(collectively "Defendants") and alleges as follows:

1

# FACTUAL BACKGROUND

## I.   Summary of Christopher Howard's Death

1.   On February 15, 2017, Christopher Howard ("Chris") was charged with violation of probation by allegedly testing positive for marijuana.  Lawrenceville police arrested Chris and transported him to Gwinnett County Jail.

2.   At approximately 11:19 p.m. on February 15, 2017, Chris entered an admissions cell known as "Cell 2."

3.   At approximately 11:21 p.m. Chris began having a seizure.

4.   In a written statement, Defendant Hartman stated:

> On Thursday, February 15, 2017, I, Cpl. Hartman (SO 1167) was assigned to Admissions for Morning Watch at the Gwinnett County Jail.  While I was conducting Admissions Count the inmates who were in Admissions Holding Cell 2 began banging on the door.  I went over to the cell and saw Inmate Christopher Howard (Inmate ID 99536297) on the floor near the phone.  Inmate Howard appeared to be having a seizure.  I then notified Central Control that Admissions had a Medical Emergency.

5.   In a written statement Defendant Dennis stated:

> On February 16, 2016, I Deputy D. Dennis SO 1357 of the Rapid Response Team (RRT) was assigned to Internal Security for the hours of 1800-0600.  At approximately 2315 hours multiple inmates inside of Admissions Cell 2 began banging on the door and yelling that there was someone having a seizure inside the cell.  Upon arriving to the cell, I saw an Inmate (later identified as Howard, Christopher #99536297), on the floor appearing to have a seizure.  I then, along with other responding deputies entered the cell in order to assist in moving Inmate Howard away from the cell wall and rotating him over to his side in order to keep him from aspirating.  Once Inmate Howard came out of his seizure, he appeared to be in a confused state and became very combative and aggressive by thrashing his legs, clinching his arms, and trying to get up off of the cell floor as deputies struggled to maintained control of him.

6.   In a written statement, Defendant Lopez-Razo stated:

> On February 15, 2017, I, Deputy Lopez-Razo (SO1257) was working Admissions for the remainder of Evening Watch.  At approximately 2320

hours there was a loud banging sound coming from holding cell (#2) in the admissions area. When I looked in the direction of the sound I could see a couple of inmates yelling to get someone's attention. I then closed cell (#4) doors in admissions area and then guided the inmates out of cell (#2) to have a seat in the admissions benches to secure the area. Once I entered cell (#2) I noticed that Inmate Howard, Christopher #99536297 was lying on the ground and being restrained by Cpl. Ross, D/S Devries, D/S Thurman and D/S Dennis due to Inmate Howard being combative.

7.   In a written statement, Defendant DeVries stated:

On the 15th day of February, 2017, I, Deputy DeVries SO1398, was working my assigned post in Pre-Admissions from the hours of 1800-0600. At approximately 2321 hours, I heard Corporal Hartman SO1267 notify Central Control via radio that he had a medical emergency in Admissions Cell 2. I immediately retrieved the transport chair from the Pre-Admissions area and responded to the emergency. As I got to Admissions Cell 2, I notice Inmate Howard, Christopher #99536297 on the floor and appeared to be having a seizure. Corporal Ross SO390, Deputy Lopez-Razo SO1257, Deputy Thurman SO1241, Deputy Dennis SO1357, Deputy Green SO1493, and I assisted in placing Inmate Howard into the recovery position. I then instructed Deputy Lopez-Razo to find some towels to place under his head. At some point during the emergency, one of the nurses yelled across the room, "make sure he's still breathing." Deputy Dennis then instructed them to come to us to help. As Inmate Howard began to regain consciousness, he became confused and combative. We then moved him to his stomach in order to maintain positive control of Inmate Howard for our safety as well as his own. Deputy Thurman maintained control of Inmate Howard's legs, I maintained control of his left arm, Corporal Ross and Deputy Lopez-Razo maintained control of his left and right arm. Inmate Howard attempted to break free of our control and nearly kicked Deputy Thurman off of him.

8.   In a written statement, Defendant Barclay stated:

I went to medicate patients in admission on the night of the incident, February 16, 2017, I was awaiting the Deputies to assist me in medicating the patients, when we heard a loud noise coming from in one of the rooms. The inmates were calling for help and said there was someone on the ground having seizures. We went to the scene immediately, and the patient was having seizures.

9.   In a videotaped interview, Defendant Nichols stated:

I was already headed down to admissions because it was shift change morning watch was about to come on. I was in the office and I heard

banging on the admissions cell, cell number two. And an inmate was standing there banging saying he had an emergency. I was in the office, Cpl. Ross I think Cpl. Hartman was there so they're going we are all going, Sgt. Thornton and I we are heading down that way. I am trying to think of what other deputy was over there at the time. When they opened the cell door we saw a guy having, the inmates kind of spread, an inmate was on the floor having a seizure by the phones. They cleared all the inmates out we were trying to get them cleared out we called the nurses over. We went on the radio and said there was a medical emergency so central 10-3. Inmates were cleared out we were waiting for the nurses to come over. Then other deputies came, the RRT deputies were coming over since it was a medical emergency. And the guy was thrashing pretty well so they were all kind of gathered around him and we were waiting for the nurses to come in. They finally came in, one sort of stood off to the side, the other ones were kind of standing there, but he was fighting pretty good trying to come out of it.

10.    In a written statement, Defendant Ross stated:

Cpl. Ross secured Howard's arms so Howard would not inadvertently strike a deputy assisting him or the ground. Howard, perhaps due to post seizure disorientation, seemed to be both confused and agitated that deputies were securing his appendages. From Cpl. Ross' knowledge, training & experience, the behavior of individuals disaffiliating with seizure like signs can range from docile to very aggressive. Cpl. Ross, as well as the other deputies involved, maintained control of Howard as it appeared that Howard was closer to the aggressive end of the spectrum.

11.    In a written statement, Defendant Lopez-Razo stated:

I was then advised by D/S Devries to go get towels, to which I did and then returned to give the deputies that were restraining Inmate Howard. I then notice that Cpl. Ross was losing his grip of Inmate Howard's left arm and stepped in to assist in restraining Inmate Howard as he continued to be combative with Deputies and Medical Staff.

12.    In a written statement, Defendant Green stated:

At approximately 2321 hours a medical emergency was called in the admissions area cell #2. When I arrived to the admissions area Inmate Howard, Christopher #99536297 was on the ground under control by the other deputies I gained head control to ensure that if Inmate Howard had another seizure he would not hit his head on the ground.

13.    In a written statement, Defendant Thurman stated:

4

When Inmate Howard came out of his seizure, he became combative by thrashing his legs, clinching his arm, and trying numerous times to get off the floor. I then placed my weight on top of Inmate Howard's legs in order to prevent him from moving. After a few moments, I then had to have some assistance staying on top of his legs. I placed my left hand on the wall and held onto Deputy Dennis to prevent myself from being kicked off. When I realized that wasn't working, I then gained left leg control and grabbed the back of Deputies Devries and Lopez-Razo's vest. I was still having trouble maintaining leg control; Deputy DeVries then wrapped his arm through the shoulder strap of my vest to prevent me from being kicked off. Lopez-Razo then reached around my back and grabbed the back of my vest and pushed me down. I was still being pushed upwards but able to maintain leg control at the time.

14.     In a written statement, Defendant Thurman stated: "I then instructed Deputy Thurman gain control using the leg-lock technique for better control and the safety of the Nurses, assisting Deputies, and himself."

15.     In reality, however, Chris was not "combative" or "aggressive." Rather he was experiencing common, and dangerous, symptoms of a generalized seizure, which include involuntary thrashing movements.

16.     In a videotaped interview, Defendant DeVries was asked, "Would it be safe to say that when he's coming out of this and he's in a medical agitated state, not in a defensive, 'I want to fight you' state?" Defendant DeVries responded, "Medically, yes. Medically, he, it's clear that he was having a legitimate seizure, didn't know what was going on."

17.     In a videotaped interview, Defendant Lopez-Razo was asked, "Did you feel like he was being aggressive in a, as in a use of force aggression, or as in a medical state aggression?" Defendant Lopez-Razo responded: "Medical state. He just didn't know where he was at."

18.     It is common knowledge, even among lay people, that you should not try to hold down or "control" a person who is experiencing a generalized seizure, which includes uncontrolled thrashing movements.

19.     Rather than provide medical attention, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman, violently restrained Chris throughout the seizure. As many as five of these Defendants at a time violently physically restrained Chris.

20.     The autopsy report shows extensive evidence of acute physical injuries that Chris did not have prior to entering Gwinnett County Jail, including extensive abrasions and contusions all over his body.

21.     Most seizures do not last longer than two minutes.

22.     A seizure lasting longer than five minutes is called status epilepticus. Status epilepticus is a life-threatening medical emergency that requires treatment in a hospital setting.

23.     After approximately nine minutes of Chris's seizure, Defendant Dennis instructed Defendants Lopez-Razo, DeVries, Thurman, and Ross to handcuff Chris.

24.     Handcuffing, or restraining in any way, a person having a seizure is extremely dangerous.

25.     In a written statement provided to the PSU, Defendant Lopez-Razo stated: "Deputy Dennis then advised me, D/S DeVries, D/S Thurman, and Cpl. Ross to secure Inmate Howard in handcuffs. Once Inmate Howard was secured in handcuffs, Inmate Howard was given a needle shot by the medical staff."

26.     In a written statement, Defendant Dennis stated: "I then assisted in maintaining control of Inmate Howard's right and left arm as each of his hands were secured in handcuffs."

27.     In a written statement, Defendant DeVries stated: "Deputy Dennis then instructed us to place him into handcuffs for safety purposes."

28.     Defendants Nurse Dillon, Nurse Edouard, and Nurse Barclay responded to Cell Two during Chris's seizure.

29.     Defendants Dillon, Edouard, and Barclay, however, did not provide any medical care while Chris's seizure continued for over 12 minutes.

30.     After approximately 12 minutes, Defendant Edouard administered an injection of Ativan, an anti-seizure medication.

31.     In a written statement, Captain Hayes stated:

> Eventually, the nurses decided to use medication to try to help Inmate Howard de-escalate or calm down. Lt. Nichols and I had briefly mentioned how slow the nurses were responding and the fact that it was taking multiple nurses to prepare the syringe with the medication and then to administer the injection. At one point, I called Central Control on my phone and asked them to make a video of the incident. I requested the video so I could review the incident to see if the nurses were moving as slowly as I thought they were. After watching the video, I determined that I placed my call to Central Control at 2327 hrs.

32.     In a videotaped interview, Captain Hayes further stated that it was not the first time he had seen a problem with the nursing staff responding too slowly.

33.     In a written statement, Defendant Nichols stated:

> The nurses began searching their equipment and re-entered the cell with a syringe and a vial of medication. Nurse Edouard attempted to fill the syringe, then passed it to the other nurse, who filled it for her. The RRT deputies continued to hold Inmate Howard and Cpl. Ross kept attempting to reassure him and keep him calm. Nurse Edouard gave Inmate Howard an injection in his hip then left the cell.

34.     In a written statement, Defendant Dennis stated:

> I then assisted in maintaining control of Inmate Howard's right leg by holding on to it in order to keep Inmate Howard from kicking one of the responding medical staff members as they were preparing to give Inmate

Howard a shot of medicine via his buttocks. Once the shot was given, Inmate Howard continued to be combative on the ground and attempted to kick and fight his way out of the control of RRT deputies. It was at this time that all responding medical staff members exited the cell and appeared to resume their duties in the admissions area. During this time Inmate Howard stated approximately two different times that he could not breathe and that he was going to throw up.

35.     In a written statement, Defendant Thurman stated:

Nurse Edward [Edouard] was then able to give Inmate Howard a shot of Ativan, 1 milligram, in the right gluteus maximus. Once the shot was given, Inmate Howard continued to be combative on the ground, attempted to kick, and fight his way out of my (Deputy Thurman) leg control. All medical staff then exited the cell and resumed their normal duties. At the same time, Inmate Howard stated that he was unable to breathe and felt like he was going to throw up. Inmate Howard was rolled to his left side to help him breathe and so that he wouldn't throw up on himself. Inmate Howard continued to be combative so he was rolled back onto his stomach so that we would have better control of his hands and leg.

36.     In a written statement, Defendant Dillon stated:

The deputies held him down for about 10 to 15 minutes and inmate Howard was still fighting. At one point Inmate Howard said "I can't breathe". I Catherine said let go of him so he can breathe, and the deputies left [lift] him up and put him in a restrained chain [chair] and strap inmate in the chain [chair].

37.     The seizure continued for an additional approximately 4 minutes after the nurses injected Ativan, making the total duration of Chris's seizure approximately 16 minutes.

38.     During this time, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman violently restrained Chris, including placing him in handcuffs while he was having a seizure.

39.     Jail surveillance video showing Chris's seizure and the response to it are available at https://www.youtube.com/watch?v=E2jg_6Xd_fY&feature=youtu.be (cited below as "Cell 2 Surveillance Video") and incorporated in this Complaint by reference.

40.     A seizure lasting longer than approximately five minutes is a medical emergency for which emergency medical personnel should be called immediately, and/or emergency medical care should otherwise be provided to the patient.

41.     Rather than call 911 or otherwise provide emergency medical care to Chris, Defendants Dillon, Edouard, and Barclay simply instructed the jail staff to take Chris to the jail's medical department (known as "JJ Medical") "immediately."

42.     Rather than take Chris to JJ Medical, however, the deputies placed him in an admissions cell known as "Cell 13."

43.     In a written statement, Defendant Thurman stated: "Nurse Edward [Edouard] then stated that Inmate Howard needed to be taken to Housing Unit JJ Medical."

44.     In a written statement, Defendant Thurman stated: "The Nurses then determined Inmate Howard's conditions to be clear from Admissions to be sent JJ Medical."

45.     The Defendant Nurses contacted Dr. Shahzad M. Hashmi, an employee or agent of Defendant CCS. In a written statement, Dr. Hashmi stated, among other things:



Howard, Christopher DOB 1-19-1994 was brought to GCDC around 04:30 PM on 2/15/2017. Patient was screened around 11:00 PM.

Patient provided us with following information about his medical history

1) He had no Meds Allergies
2) He had no acute illness except MCAD (Medium-chain acyl-CoA dehydrogenase deficiency) and patient stated at intake that his brother died of MCAD.
3) No current medications and no drugs use

His Vital Signs at intake were

Blood Pressure 129/71 Pulse 88, R 16 / min, Temp 98.6, O2 Sat 98 % at room air and BSR 94 mg/dl WT 195 lb, HT 6.5.

Patient was reported to have a seizure episode at 11:25 PM in his cell and was provided medical care by nursing staff. Following his seizure patient became agitated and was administered Ativan injection 2mg. Patient oxygen Saturation was 98% however unable to obtain other vital signs due to agitation.

At 11:47 PM I received a call from admission.

Based on information provided by the nurse, I gave the following orders

1) ASAP transfer to the infirmary for further monitoring
2) ACCU Check BID for 5 days
3) Keppra 500 mg po BID 45 days.
4) Neuro check Q6 hourly for 48 hours

Subsequently patient was transferred to Infirmary at 00:33 on 2/16/17 as per nursing staff.

At 00:33 received a call from the infirmary stating patient had arrived with security and upon arrival found to be pulseless. CPR had been initiated and 911 had been notified as per nurse.

46.    In a written statement, Defendant Dennis stated:

> Nurse Edouard then stated that Inmate Howard needed to be taken to Housing Unit JJ Medical. Due to Inmate Howard still being combative, I then told Deputy Devries to ask the medical staff if Inmate Howard could stay in Admissions Cell 13, which is commonly used for medical observation, until he calmed down, in order to prevent having to struggle or fight with him in the dress out room while trying to dress him into an inmate uniform after already having a seizure."

47.    In a videotaped interview, Defendant Dennis was asked why the deputies did not

take Chris to JJ Medical in his current attire. Defendant Dennis stated: "I've never encountered

a situation where we've taken an inmate down to JJ or anywhere throughout the jail with regular clothes on."

48. In a written statement, Defendant DeVries stated:

> The nurses then requested that we get him to JJ-Medical immediately. Due to his combative state, Deputy Dennis made a tactical suggestion that we place him inside Admissions Cell 13 in order for him to calm down. I asked the nurses if this was okay and they said "he needs to go to JJ ASAP." The nurses then began converse among themselves to talk to the Admissions Supervisor about the situation. I then suggested that we just take Inmate Howard down to JJ-Medical in his personal clothes for immediate treatment and change him into a county uniform after he calmed down. I did not get a response to my suggestion.

49. In a written statement, Defendant Thurman stated:

> Due to Inmate Howard being combative, it was then determined that he would be placed in Admissions Cell 13 to be observed by the admissions medical staff as he calmed down and recovered from his seizure before being dressed in and taken to JJ Medical. Deputy Dennis then retrieved the transport chair and I was given instructions to relinquish leg control.

50. Video of Chris shows, however, that he was not combative. Rather he was docile and extremely weak. Defendants had to lift him into the transport chair because he could not stand on his own. *See Cell 2 Surveillance Video*, https://www.youtube.com/watch?v=E2jg_6Xd_fY&feature=youtube, at 19:10–19:30.

51. In a written statement, Defendant Hartman stated: "Inmate Howard was then helped into the Transport Chair and taken to Admissions Cell 13. Nurse Edouard told me (Cpl. Hartman) that Inmate Howard needed to go to JJ Medical as soon as possible."

52. In a videotaped interview, Defendant Lopez-Razo stated: "Yes, I think medical said he needed to go to JJ, but he was still in his civilian attire so he needed to be changed out. SO I believe he was in 13 to get changed out and then go to JJ."

53.    In a videotaped interview, Defendant Dillon explained that she and other nurses told the deputies multiple times that Dr. Hashmi has ordered that Chris be taken to JJ Medical immediately. Defendant DeVries responded that his squad leader, Defendant Dennis has instructed them to take Chris to Cell 13 instead. Defendant Dillon then said, "you people do what you need to do we are telling you he needs to go to medical immediately."

54.    Instead of taking Chris to JJ Medical immediately as instructed by the medical professionals, Defendants Dennis, DeVries, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton placed Chris in a restraint chair and left him in the admissions area just outside of Cell 2.

55.    When the deputies placed Chris in the transport chair he was obviously not combative, he obviously did not need to "calm down," and he was obviously in need of emergency medical care.

56.    In a videotaped interview, Defendant DeVries stated that when they placed Chris in the transport chair he was "dead weight," he "wasn't able to pick himself up at all," and he was unable to speak, but was "kind of moaning."

57.    Defendant DeVries further stated that his "gut instinct" at this time was "get him to medical," that he heard the nurses say Chris needed to go to medical, and that he suggested they simply take Chris to medical in his personal clothes.

58.    The nurses again attempted to examine Chris, but Defendants Dennis, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton prevented them from doing so.

59.    Defendant Hayes stated in a written statement that while in the restraint chair outside of Cell 2 Chris was calm and not aggressive.

60.     At this time, Defendant Nurse Barclay again instructed the deputies to take Chris to JJ Medical.

61.     At this time, both Nurse Edouard and Dillon told again the deputies that Chris needed to go to JJ Medical immediately.

62.     Instead of taking Chris to JJ Medical immediately as instructed by the medical professionals, Defendants Dennis, DeVries, Ross, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, and Thornton took Chris to Cell 13 via the restraint wheelchair.

63.     In a videotaped interview, Defendant Campbell stated: "Unfortunately, we have so many seizures around here it's kind of like—I related it to the story of the boy who cried wolf."

64.     When Chris was taken to Cell 13, he was obviously not combative.

65.     Rather, he was unable to even get out of the transport chair under his own power.

66.     When Chris was taken to Cell 13, he was obviously in need of emergency medical care.

67.     In a videotaped interview, Defendant Casey stated: "I saw they had to help the guy kind of get into the cell and then they closed the door and then everything went on about its business . . . ."

68.     In a written statement, Defendant Lopez-Razo stated: "Once in cell #13 Inmate Howard was helped out of the transport chair and placed onto his belly on the floor of the cell."

69.     In a written statement, Defendant DeVries stated: "Deputy Lopez-Razo and I assisted Inmate Howard out of the transport chair and on to his belly inside of Admissions Cell 13."

13

70. When asked if Chris was "still dead weight" when they placed him in Cell 13, Defendant DeVries stated, "Yes, ma'am."

71. In a written statement, Defendant Dennis stated: "I then escorted Inmate Howard to Admissions cell 13 via the transport chair. I then assisted in standing Inmate Howard to his feet and then laying him down on the ground inside the cell."

72. Jail surveillance video showing Chris in Cell 13 is available at https://www.youtube.com/watch?v=kbMeiY-1S3k&feature=youtube (cited below as "Cell 13 Surveillance Video") and incorporated in this Complaint by reference.

73. Defendant Dennis further stated that because Cell 13 is right in front of the supervisors' office, the supervisors could see they were leaving Chris in Cell 13. Accordingly, Defendants Campbell and Casey knew Chris was left in Cell 13 even though medical professionals had ordered Chris to be taken to JJ Medical immediately and took no action to correct the situation.

74. In Cell 13, for approximately 30 minutes, Chris writhed on the ground in pain, occasionally making it to his knees to bang on the window and beg for help. *See Cell 13 Surveillance Video.*

75. In a videotaped interview, Defendant Campbell stated that he passed by Cell 13 and looked in on Chris and Chris was "struggling to breath."

76. Yet Defendant Campbell did not provide any assistance to Chris.

77. In a written statement Sergeant Welch stated:

> While we (Sgt. Welch) were all still in the area of the Sergeant's Office, the Admission Nurse stepped to the door of the office at approximately 00:20, handed Sgt. Campbell a plastic bag with Mr. Howard's medical paperwork, and told him that Mr. Howard was ready to be sent to JJ-Medical. I witnessed Sgt. Campbell pass this information on to RRT

Squad Leader Dennis, who confirmed that they would get Mr. Howard dressed into a GCDC Uniform and take him to JJ-Medical immediately.

78. In a written statement, Defendant Campbell stated:

At about 0022 hours, Nurse Edouard from the Med2 Station, looked into cell #13 and told Corporal P. Hartman {SO-1167} that Howard needed to be sent to JJ-Medical as soon as possible because he did not look good. I immediately called on the radio for either Deputy D. Dennis {SO-1357} or Deputy D. Williams {SO-1416} to meet with me in Admissions. Both deputies arrived instead of just one. I explained that Howard needed to be dressed into a jail uniform and escorted to JJ-Medical.

79. After approximately 30 minutes in Cell 13 while Chris's medical emergency continued, deputies finally came to get him.

80. By that time, Chris's crisis had worsened, and his condition further declined.

81. The deputies, however, still did not take Chris to receive medical attention. Rather, they took him to yet another room within the jail to change his clothes to a jail uniform.

82. In a videotaped interview, Defendant Campbell stated: "I guess it is normal procedure for them to be in uniform before going to JJ Medical."

83. Rather than get Chris the emergency medical attention he obviously needed, Defendants Hartman, DeVries, Williams, and Dennis changed Chris's clothes, further delaying life-saving medical treatment by at least 12 minutes.

84. In a written statement, Defendant Hartman stated:

Nurse Edouard told me that Inmate Howard needed to go to JJ Medical as soon as possible. About five minutes later I opened the cell door and asked Inmate Howard if he could stand up. Inmate Howard said he could not. I then helped Inmate Howard sit up. At that time Deputy Devries (SO 1398) entered the cell and assisted me with putting Inmate Howard in the Transport Chair. Inmate Howard was then escorted to the dress out room. Deputies Williams (SO 1416), Dennis (SO1357), Devries and I helped dress Inmate Howard into a Gwinnett County Jail uniform. When we finished Deputies Dennis and Williams escorted Inmate Howard to JJ Medical by using the Transport Chair.

85.     In a videotaped interview, Defendant Hartman further stated: "We got him in the transport chair (from 13) and took him to the dress out room and he left the admissions area."

86.     In a written statement, Sargent Welch stated: "Mr. Howard was assisted to a Transport Chair and taken to the Property Room. Once the Dress-in Process was complete, he was escorted to JJ-Medical by RRT Deputy Dennis and RRT Deputy D. Williams."

87.     In a written statement, Defendant DeVries stated: "I noticed that Inmate Howard was very weak and could not stand on his own. We then escorted him to the Dress In room to be changed over into a county uniform. Inmate Howard was too weak to stand or dress himself."

88.     In a videotaped interview, Defendant DeVries further stated that Chris was clearly "out of it," his breathing was slow, his eyes were closed, he was unable to move, and he was not acknowledging any questions.

89.     Jail surveillance video showing the deputies retrieving Chris from Cell 13 and transporting him to "property" is available at https://www.youtube.com/watch?v=AKbOd7RIgZE&feature=youtube and incorporated in this Complaint by reference.

90.     In a written statement, Defendant Williams stated:

> At approximately 0020 hours I and Deputy Dennis were called via radio from admission advising that here was an inmate that needed to be dressed out and escorted to JJ Medical. Inmate previously had a medical emergency in Admission. Once arriving to Admission Inmate Howard Christopher (99536297) was being escorted via transport chair to the property dress out room. Once inside I then assisted along with other Rapid Response Team helping inmate Howard dress out into a county issued uniform. Once inmate Howard was dressed out I along with Deputy Dennis escorted him down to JJ Medical. While escorting inmate Howard down to JJ Medical I begin to talk to inmate Howard making sure he was alert. He showed slight signs of movement but no verbal response.

91.    After changing a largely lifeless Chris into a county uniform, the deputies finally, casually transported him to JJ Medical.

92.    Video shows that in the transport chair Chris was limp and unconscious. His leg fell off the transport chair twice and Defendant Williams had to put it back on. In a videotaped interview, Defendant Williams stated: "At that time I said to [Defendant] Dennis, 'we need to hurry up and get him to medical now.' And at that moment we didn't run with him, but we kinda speeded up our pace to get him to JJ."

93.    Jail surveillance video showing the deputies transporting Chris from "property" to JJ Medical is available at https://www.youtube.com/watch?v=AzJaaPh2dHM&feature=youtu.be and incorporated in this Complaint by reference.

94.    When Chris finally arrived at JJ, Defendant Dillon said to the deputies, "Ya'll brought a dead man."

95.    In his written statement, Defendant Williams further stated:

> Once we arrived to JJ Medical we were asked by the medical staff "why is this inmate coming down here". I replied we were told by the medical staff in Admission that inmate Howard needed to come down. The nurse Annabo replied "this inmate is sick and non-responsive he need to go to the hospital". Nurse then checked inmate Howards vital and noticed that he had no pulse.

96.    Defendant Dennis stated:

> At approximately 0025 hours Deputy Williams and I arrived to Housing Unit JJ Medical. Once in Housing Unit JJ Medical, I instructed the Housing Unit Deputy, Deputy Salnave S01492, to place the female inmate who was being seen by the nursing staff into a cell and asked the JJ Medical Nurse Idubor if she needed to check Inmate Howard's vital signs before placing him in a cell. The Nurse Idubor immediately looked at Inmate Howard and asked "why is he coming down here." I then replied that the admissions medical staff, Nurse Dillon and Edouard, said that he needed to be sent to JJ Medical. The JJ Medical nurses (Nurse Idubor and Nurse Bucknor) then said "this guy does not look good at all," "he's

unresponsive," and, "he needs to go out," "call 911." Deputy Williams then asked "should we start doing CPR?" Nurse Bucknor said "yes."

97.  In nursing progress notes, Nurse Bucknor stated:

> 02/16/2017 at 00:33, Patient (Christopher Howard) brought to JJ Medical via Transport Chair accompanied by the deputies. Upon arrival nurse immediately notice patient was unresponsive, no spontaneous breathing, heart sound not audible, pulses not palpable, skin temperature very cold to touch, pale eyes fixed and dilated. Instantly deputies were told to unstrap patient from the transport chair and place patient on the floor for emergency care. Deputy on duty in JJ Medical was instructed to call Medical Emergency and call 911. At 00:34 CPR was started, oxygen, arabu (sp) bag, and AED applied. Through CPR AED Machine advised no schock (sp). Dr. Hasmi made aware of patient condition and was advised to continued CPR. Patient remained unresponsive, no pulse or signs of breathing. At 0047 911 arrived and continued with CPR. Patient left JJ Medical via stretcher at 00:55 and patient was still unresponsive and pulseless.

98.  In nursing progress notes, Nurse Idubor stated:

> 02/16/17 00:33 Inmate arrive [sic] in JJ strapped in the transport chair accompanied by the deputies. We immediately notice inmate was unresponsive, pale, skin, cold to touch, both eyes fixed & dileted [sic], no chest movement noted. Immediately, deputies were asked to unstrap inmate from the transport chair and placed on the floor for emergency care. Unable to palpabe [sic] pulse or obtained vitel [sic] signs. Instantly deputy was instructed to call for medical emergency and 911. CPR was initiated at 00:34, oxygen was given AED machine advised no shock to continue CPR. Dr. Hasmi was informed of inmate general condition and advised to continue with CPR. Inmate was still unresponsive. Still unable to obtained vls [sic]. At 00:47 911 arrive in JJ and continued with the CPR. The inmate left JJ in stretcher at 00:55 still unresponsive.

99.  At approximately 1:00 a.m. on February 16, 2017, Chris was finally taken to a hospital, Gwinnett Medical Center.

100.  At Gwinnett Medical Center, Chris was diagnosed with anoxic encephalopathy secondary to cardiac arrest progressed to brain death.

101.  Chris never regained consciousness.

102.  Chris died on February 17, 2017.

103.    If Chris had received prompt medical attention when he became status epilepticus, his life would have been saved.

104.    "Duration of [status epilepticus] is the only potentially modifiable determinant of mortality. With earlier diagnosis as well as prompt initiation and completion of treatment, duration can be directly modified." Jane G. Boggs, *Mortality Associated with Status Epilepticus*, EPILEPSY CURR, Jan. 2004, 4(1) at 25.

105.    When status epilepticus is not treated aggressively within the first hour, the mortality rate increases from 3.7% to 34.8%. *Id.*

106.    "Unfortunately, issues that are highly individual to a given patient, such as transportation, intravenous (IV) access, electroencephalogram (EEG) availability, hemodynamic instability, and airway management can add critical minutes, even hours to the timing of initiation and effectiveness of treatment." *Id.*

107.    At the Gwinnett County Jail, Chris had immediate access to transportation, IV, EEG, and airway management.

108.    The Defendants simply chose not to provide these things.

109.    Instead, Chris's status epilepticus was never treated aggressively in in the over 90 minutes between its onset and Chris's cardiac arrest.

110.    As a result, Chris suffered a slow and painful death.

## II.    The Jail Uniform Policy

111.    Defendants Conway, Woods, Dennis, Casey, and Campbell created, maintained, and enforced a policy, custom, and practice of requiring inmates to be dressed in a Gwinnett County Jail uniform before they could receive medical care.

112.    Accordingly, Defendants Conway, Woods, Dennis, Casey, and Campbell engaged in a custom or policy that resulted in the arbitrary denial of access to medical care for inmates and deliberate indifference to their constitutional rights.

113.    Defendants Conway, Woods, Dennis, Casey, and Campbell directed their subordinates to unlawfully deny inmates access to medical care.

114.    Defendants Conway, Woods, Dennis, Casey, and Campbell were on notice of a history of widespread denial of access to medical care in violation of their constitutional rights that needed correcting and they failed to do so.

115.    At all times relevant to this Complaint, Defendants Conway, Woods, Dennis, Casey, and Campbell knew that it was foreseeable that their subordinates would violate the constitutional rights of inmates such as Chris by denying them access to medical care, and had actual knowledge that their subordinates were in fact denying inmates access to medical care and violating constitutional rights of Chris and other inmates.

116.    Defendants Conway, Woods, Dennis, Casey, and Campbell have directed, condoned, and caused the denial of access to medical care by the jail staff, which resulted in the unreasonable and unconstitutional denial of access to medical care for Chris.

### III.    The Rapid Response Team Use of Force Policy

117.    At all times relevant to this Complaint, Defendant Conway maintained a Rapid Response Team (the "RRT") that was established to provide a prompt tactical response in the event of a riot or other emergency within the jail.  The RRT has since come to be used to exert control over disruptive inmates.

118.    At all times relevant to this Complaint, Defendants Woods and Conway have improperly used the RRT for unconstitutional purposes such as the unreasonable use of force and

20

the wanton and unnecessary infliction of gratuitous pain against inmates who were deemed uncooperative but did not pose a threat justifying the use of force against them.

119. At all times relevant to this Complaint, Defendants Woods and Conway have directed the RRT to engage in the systemic use of unreasonable and excessive force against Chris and other inmates, have trained the RRT to use unreasonable and excessive force against Chris and other inmates, have instituted procedures that caused the RRT to systematically use unreasonable and excessive force in violation of the constitutional rights of Chris and other inmates, and have condoned, encouraged and approved such use of unreasonable and excessive force with deliberate indifference to the constitutional rights of Chris and other inmates.

120. The use of unreasonable and excessive force by the RRT is so frequent, pervasive, and well documented that it rises to the level of a pattern or practice of using excessive force, which is tantamount to an official custom or policy that constitutes said Defendants' actual policy irrespective of what their written policies may state.

121. For example, the jail's written use of force policy which was adopted or approved by Defendant Conway, or under authority delegated by Conway, states that officers in the jail should "use only that force which is necessary to maintain the security and safety of all persons, staff, and inmates," but it is clear in practice that the jail's actual policy is to tolerate excessive force by the RRT on a routine basis.

122. The policy requires that the jail administrator review all uses of force in the jail, including planned and unplanned uses of force by the RRT, and that authority was delegated to Woods in his roles as deputy administrator, RRT commander, and/or other supervisory positions. Despite having reviewed hundreds of RRT uses of force, Woods has never found any of them to be in violation of the jail's alleged use of force policy, which indicates that the incidents

involving excessive force were all pursuant to the direction and training provided by Defendants Woods and Conway.

123. The jail's written use of force policy also states that "no facility employees will strike or lay hands on any inmate except when it is necessary to prevent escape, to prevent injury to other persons and/or damage to property, to quell a disturbance, or as is otherwise necessary in the lawful discharge of their duties," but it is evident on a routine and near daily basis that the RRT is permitted, encouraged, and expected to "lay hands on" or otherwise use force against inmates where there is no justification for the use of force under the law or under the empty words of the policy, indicating that the custom, practice and actual policy of the jail is to give the RRT authority to use unreasonable and excessive force anytime it chooses.

124. To the extent that the jail's written use of force policy is actually followed rather than ignored, it encourages the RRT to use excessive force because it authorizes officers to use force to "quell a disturbance" without defining what a disturbance is, leading officers to believe that they can use force anytime an inmate makes noise even though the inmate poses no actual threat justifying the use of force under the law.

125. To the extent that it is followed at all, the written use of force policy is also defective because it leads officers to believe that they can enter a holding cell and use force – thereby injuring an inmate – in order to prevent the inmate from injuring himself or herself, which has been cited on many occasions as the justification for the RRT to enter a holding cell and use force against an inmate who is knocking on the cell door to get the attention of a staff member. The written use of force policy specifically gives officers the authority to use restraints in response to self-harming behavior, and since the use of four-point restraints is a routine component of both planned and unplanned uses of force by the RRT, it is evident in practice that

the RRT equates the alleged justification for restraint with the alleged justification for force since they are routinely applied together. Both the alleged policy as written and the actual policy as applied in practice result in the unreasonable and unnecessary use of force, including prolonged restraint, against inmates including Chris while he was experiencing a seizure.

126.    Similarly, the jail's written use of force policy provides that "any staff member who encounters an uncooperative inmate" and is unable to persuade the inmate to cooperate using verbal communications "should never hesitate to summon assistance when necessary," which causes staff members to summon the RRT, which routinely uses excessive force without regard for whether the inmate's perceived lack of cooperation lawfully justifies the level of force used.

127.    Defendants' custom, practice and policy as commanders, supervisors and trainers of the RRT is that inmates subjected to the use of force are routinely placed in a restraint chair and continually restrained for a period of approximately four hours without regard for whether the use of force or restraints was justified in the first place, and without regard for whether prolonged continuous restraint is necessary.

128.    As commander of the RRT, as the principal trainer for most RRT members, and as a de facto supervisor of the RRT at all times relevant to this Complaint, Defendant Woods has actual knowledge of the fact that the RRT routinely uses unreasonable and excessive force against inmates, and he has in fact trained and directed the RRT to use such force with deliberate indifference to the constitutional rights of Chris and other inmates.

129.    As sheriff, Defendant Conway is the final decision-maker and ultimate policymaker of the Gwinnett County Jail, responsible for the oversight, supervision and training of his deputies and detention officers. As sheriff, Defendant Conway has actual knowledge of

the fact that the RRT routinely uses excessive force against inmates, has adopted or approved both formal and informal policies that have caused the RRT to use unreasonable and excessive force against Chris and other inmates, and has tolerated and condoned the use of excessive force by the RRT with deliberate indifference to the constitutional rights of Chris and other inmates.

130.    At all times relevant to this Complaint, Defendant Conway knew that it was foreseeable that Defendant Woods and the RRT under his command would violate the constitutional rights of inmates such as Chris by using excessive force against them, and Defendant Conway had actual knowledge that Defendant Woods and the RRT under his command were in fact using excessive force and violating constitutional rights of Chris and other inmates.

131.    Defendants Woods and Conway have caused the RRT to use unreasonable and excessive force against Chris and other inmates as demonstrated by the following facts, among others:

   a.      Defendant Woods reviewed the RRT members' use of force during Chris's medical emergency and stated, "I believe their actions were in line with their training."

   b.      The RRT conducts itself in the same methodical manner in virtually every incident, which indicates that they are acting in accordance with training and not on a random or ad hoc basis.

   c.      The RRT members have acted exactly as they were trained to do, and they would have acted differently had they been trained differently.

   d.      Defendant Conway has ultimate responsibility for making use of force policy for the jail, as well as making sure that the policy is enforced, but video recordings

of RRT uses of force indicate that the jail's alleged written policy has not been enforced because they demonstrate that excessive force is routinely used.

  e.  Every use of force by the RRT has been approved by Defendant Woods as being within policy, which would only be true if the policy was to condone the use of excessive force by the RRT.

  f.  Defendants Woods and Conway have reviewed many RRT videos but have never expressed criticism of the RRT's use of force, even though video evidence clearly shows that excessive force is routinely used.

  g.  Until 2018, Defendants Woods and Conway had never disciplined an officer for excessive force during an RRT action, despite the fact that hundreds of incidents of excessive force had occurred over a period of several years, although at least one RRT member has been removed for complaining about the use of excessive force by another RRT member.

  h.  Defendants Woods and Conway have continued to tolerate, condone, and encourage the use of excessive force by the RRT even after the United States Court of Appeals for the Eleventh Circuit ruled that the RRT's use of force under circumstances such as those alleged by Chris amounts to a federal constitutional violation, and Defendants have made no substantive changes in their policies or practices to bring the RRT's conduct into compliance with that ruling.

132.  Defendants Woods and Conway have directed, condoned, and caused the use of unnecessary and excessive force by the RRT, which resulted in the use of unreasonable and unconstitutional force against Chris.

## PARTIES

133.    Plaintiff Robert Howard is a resident of the State of Georgia.

134.    Defendant R.L. "Butch" Conway ("Defendant Conway" or "Conway") is, and was at all times relevant to this Complaint, the duly elected Sheriff of Gwinnett County, Georgia.

135.    Defendant Captain Frank Woods ("Woods") was at all times relevant to this Complaint the Commander of the jail's Rapid Response Team, and a supervisor acting under the authority or direction of Sheriff Conway who, at all times relevant to this Complaint, had supervisory authority over both the team and its members who were employed by the sheriff as detention officers at the jail.

136.    Defendant Dominique Dennis was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team.  On February 15, 2017, Defendant Dennis was the RRT Squad Leader and was the supervisor responsible for the RRT that responded to Chris's medical emergency. At all times relevant to this Complaint, Defendant Dennis was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

137.    Defendant Gregory Ross was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team.  At all times relevant to this Complaint, Defendant Ross was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

138.    Defendant Aaron DeVries was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid

Response Team. At all times relevant to this Complaint, Defendant DeVries was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

139. Defendant Amber Ashley Thurman was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Thurman was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

140. Defendant Adam Green was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Green was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

141. Defendant Philip Hartman was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Hartman was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

142. Defendant Ilene Nichols was, at all times relevant to this Complaint, a lieutenant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Nichols was an employee or agent of the Gwinnett County

Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

143. Defendant Thomas Hayes was, at all times relevant to this Complaint, a captain of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Hayes was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

144. Defendant Martin Campbell was, at all times relevant to this Complaint, a sergeant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Campbell was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

145. Defendant Darius Williams was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Williams was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

146. Defendant Juan Lopez-Razo was, at all times relevant to this Complaint, a deputy of the Gwinnett County Sheriff's Department and a member of the Gwinnett County Jail Rapid Response Team. At all times relevant to this Complaint, Defendant Lopez-Razo was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

147.     Defendant J.B. Thornton was, at all times relevant to this Complaint, a sergeant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Thornton was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

148.     Defendant James Casey was, at all times relevant to this Complaint, a lieutenant of the Gwinnett County Sheriff's Department working at the Gwinnett County Jail. At all times relevant to this Complaint, Defendant Casey was an employee or agent of the Gwinnett County Sheriff's Department, acted within the scope of his employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

149.     Defendant Correct Care Solutions LLC is a company existing under the laws of Tennessee and registered to do business in Georgia. Correct Care Solutions LLC's agent for service of process is Corporate Creations Network Inc. located at 2985 Gordy Parkway, 1st Floor, Marietta, GA, 30066. Correct Care Solutions, LLC, is now a wholly-owned subsidiary of Defendant Correct Care Solutions Group Holdings, LLC, d/b/a Wellpath. Defendant Correct Care Solutions Group Holdings, LLC d/b/a Wellpath is a company existing under the laws of Delaware. Defendants Correct Care Solutions LLC and Correct Care Solutions Group Holdings, LLC d/b/a Wellpath, are collectively referred to in this Complaint as "CCS."

150.     Defendant Catherine Dillon is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Dillon was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Dillon was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

151.    Defendant Myriam Edouard is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Edouard was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Edouard was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

152.    Defendant Estella Barclay is an individual residing in the State of Georgia. At all times relevant to this Complaint, Defendant Barclay was a licensed nurse working at Gwinnett County Jail. At all times relevant to this Complaint, Defendant Barclay was an employee or agent of Defendant CCS and was acting within the scope of her employment or agency with CCS.

153.    Defendant Gwinnett County is duly created and existing political entity under the laws of the state of Georgia that has the capacity to sue and be sued, and is being sued in connection with duties that it owes as a county government. Gwinnett County may be served with process through its Chairman of the Board of Commissioners, Charlotte Nash, 75 Langley Drive, Lawrenceville, GA 30046.

154.    Doe Defendants 1 through 5 are individuals working in the Gwinnett County Jail on February 15, 2017 or February 16, 2017 who either (1) participated in the action of placing Chris in Cell 13 rather than JJ Medical; (2) participated in the decision to place Chris in Cell 13 rather than taking him to JJ Medical; or (3) had knowledge of Chris's condition and failed to provide or obtain medical care for Chris. At all times relevant to this Complaint, Doe Defendants 1 through 5 were employees or agents of the Gwinnett County Sheriff's Department, acted within the scope of their employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

155. Doe Defendants 6 through 10 are the individuals not otherwise named in this Complaint who either (1) participated in restraining Chris inside Cell 2 rather than allowing him access to medical care. At all times relevant to this Complaint, Doe Defendants 6 through 10 were employees or agents of the Gwinnett County Sheriff's Department, acted within the scope of their employment or agency with the Gwinnett County Sheriff's Department, and acted under color of state law.

## JURISDICTION AND VENUE

156. This Court has jurisdiction over each Defendant.

157. This Court has jurisdiction over the subject matter of this action.

158. Venue is proper in Cobb County because one or more of the defendants is a resident of Cobb County.

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, Thornton, Campbell, Williams, Casey, and Does 1 through 10 Based Upon Deliberate Indifference to Serious Medical Needs**

159. Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

160. Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, Hartman, Nichols, Hayes, Thornton, Campbell, Williams, Casey, and Does 1 through 10 (collectively the "Count I Defendants"), acting under color of state law, were responsible for providing Chris access to medical care.

161. While in the custody and care of the Count I Defendants, Chris had serious, life-threatening medical needs.

31

162.     A lay person would recognize the necessity for a doctor's attention for someone in Chris's condition as described above.

163.     Chris's medical condition was diagnosed by Dr. Hashmi as mandating treatment.

164.     A delay in treating a prolonged seizure worsens the condition.

165.     The Count I Defendants had actual knowledge of Chris's serious medical needs.

166.     The Count I Defendants were deliberately indifferent to Chris's serious medical needs in at least the following ways:

    a.     The Count I Defendants refused to call 911 or otherwise obtain emergency medical treatment for Chris;

    b.     The Count I Defendants refused to take Chris to JJ Medical despite express instructions for medical personnel to do so and, instead, placed Chris in cell 13 for over 40 minutes;

    c.     The Count I Defendants knew that Chris has been placed in Cell 13 despite needing emergency medical care for serious medical needs and took no action to provide him access to medical care;

    d.     The Count I Defendants denied Chris access to medical personnel qualified to treat his serious medical needs;

    e.     The Count I Defendants failed to inquire into the essential facts that were necessary to make a professional judgment about Chris's serious medical needs;

    f.     The Count I Defendants caused factors unrelated to inmates' medical needs to interfere with the exercise of medical judgment regarding Chris's serious medical needs;

g.     The Count I Defendants failed to carry out medical orders pertaining to Chris's serious medical needs; and

h.     The Count I Defendants used unreasonable and excessive force to restrain Chris which both worsened his medical condition and prevented others from providing him medical care.

167.    The Count I Defendants' knowledge of Chris's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

168.    The Count I Defendants' failure to allow Chris access to medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

169.    Accordingly, the Count I Defendants' deliberate indifference to Chris's serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourth and Fourteenth Amendments.

170.    As a direct and proximate result of the Count I Defendants' deliberate indifference to Chris's serious medical needs, Chris experienced conscious pain and suffering and died.

## Count II

**42 U.S.C. § 1983: Supervisory Liability for Deliberate Indifference to Serious Medical Needs in Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Campbell, Casey, and Conway**

171.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

172.    Defendants Conway, Dennis, Casey, and Campbell (collectively the "Count II Defendants") have supervisory liability under 42 U.S.C. § 1983 for the violation of Chris's constitutional rights because the Count II Defendants implemented, maintained, and enforced a

33

policy or custom requiring jail inmates to be dressed in a jail uniform before being allowed access to medical care.

173.    The Count II Defendants had actual knowledge that their policy or custom caused medical care for inmates to be denied or delayed and nonetheless continued to maintain and enforce the policy or custom.

174.    The Count II Defendants' jail uniform policy or custom constitutes deliberate indifference to Chris's serious medical needs.

175.    As a direct result of the policy or custom of denying access to medical care until inmates are dressed in a jail uniform, Chris was denied access to medical care while suffering a life-threatening medical emergency.

176.    As a result of that denial of medical care caused by the Count II Defendants' policy or custom, Chris experienced conscious pain and suffering and died.

## Count III

**42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dillon, Edouard, and Barclay Based Upon Deliberate Indifference to Serious Medical Needs**

177.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

178.    Defendants Dillon, Edouard, and Barclay (collectively the "Count III Defendants"), acting under color of state law, were responsible for providing medical care to Chris.

179.    While in the custody and care of the Count III Defendants, Chris had serious, life-threatening medical needs.

180.    A lay person would recognize the necessity for a doctor's attention when someone experiences a prolonged seizure.

181. Chris's medical condition was diagnosed by Dr. Hashmi as mandating treatment.

182. A delay in treating a prolonged seizure worsens the condition.

183. The Count III Defendants had actual knowledge of Chris's serious medical needs.

184. The Count III Defendants were deliberately indifferent to Chris's serious medical needs in at least the following ways:

    a.    The Count III Defendants refused to call 911 or otherwise obtain emergency medical treatment for Chris;

    b.    The Count III Defendants did not provide any medical treatment for Chris's seizure for over 12 minutes.

    c.    The Count III Defendants denied Chris access to medical personnel qualified to treat his serious medical needs;

    d.    The Count III Defendants failed to inquire into the essential facts that were necessary to make a professional judgment about Chris's serious medical needs;

    e.    The Count III Defendants caused factors unrelated to inmates' medical needs to interfere with the exercise of medical judgment regarding Chris's serious medical needs; and

    f.    The Count III Defendants failed to carry out medical orders pertaining to Chris's serious medical needs.

185. The Count III Defendants' knowledge of Chris's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

186. The Count III Defendants' failure to allow Chris access to medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

187.    Accordingly, the Count III Defendants' deliberate indifference to Chris' serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Fourth and Fourteenth Amendments.

188.    As a direct and proximate result of the Count III Defendants' deliberate indifference to Chris's serious medical needs, Chris experienced conscious pain and suffering and died.

## Count IV

### 42 U.S.C. § 1983: Violation of the Fourth and Fourteenth Amendments by Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman Based Upon Excessive Use of Force

189.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

190.    Chris had a Fourteenth Amendment right to be free from the use of excessive force, and the Fourth Amendment requires that any force used against a pretrial detainee be objectively reasonable under the totality of the circumstances.

191.    There was no factual or legal justification for Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman (collectively the "Count IV Defendants") to use the force described in this Complaint against Chris.

192.    Chris was subjected to the use of excessive force in violation of the Fourth Amendment because the force used against him was not objectively reasonable, was not necessary to maintain or restore discipline, and was gratuitous, unnecessary, and entirely punitive.

193.    The excessive force used by the Count IV Defendants both worsened Chris's medical emergency and prevented medical personnel from providing medical care to Chris.

36

194.    Accordingly, Defendants Dennis, Ross, DeVries, Thurman, Lopez-Razo, Green, and Hartman are liable for violating Chris's Fourth and Fourteenth Amendment rights.

195.    As a direct result of the Count IV Defendants' use of excessive force in violation of Chris's Fourth and Fourteenth Amendment rights, Chris experienced conscious pain and suffering and died.

## Count V

### 42 U.S.C. § 1983: Supervisory Liability for Excessive Force in Violation of the Fourth and Fourteenth Amendments by Defendants Woods and Conway

196.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

197.    Chris had a Fourteenth Amendment right to be free from the use of excessive force, and the Fourth Amendment requires that any force used against a pretrial detainee be objectively reasonable under the totality of the circumstances.

198.    There was no factual or legal justification for the use excessive force against Chris described in this Complaint

199.    Defendants Woods and Conway have supervisory liability under 42 U.S.C. §1983 for the violation of Chris's constitutional rights because (1) Woods and Conway engaged in customs or policies that caused use of excessive force against Chris in violation of his constitutional rights; (2) Woods and Conway directed, encouraged, and caused the use of unreasonable and excessive force against Chris in violation of his constitutional rights; or (3) Woods and Conway's deliberate indifference to the constitutional rights of Chris and other inmates proximately caused the use of such unreasonable and excessive force against Chris.

200.    Accordingly, Defendants Woods and Conway are liable for violating Chris's Fourth and Fourteenth Amendment rights and as a direct result of those constitutional violations Chris experienced conscious pain and suffering and died.

### Count VI

**42 U.S.C. § 1983: County Liability for Violation of the Fourth and Fourteenth Amendments by Defendants CCS and Gwinnett County**

201.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

202.    As described above, the conduct of Defendants Dillon, Edouard, and Barclay constituted deliberate indifference to Chris's serious medical needs in violation of his constitutional rights.

203.    At all relevant times, Defendant CCS was the policymaker and final decision-maker with respect to the medical care of inmates in the Gwinnett County Jail under authority delegated by the county, which has a statutory duty to provide such care under Georgia law.

204.    At all relevant times, Defendant CCS was the final repository of county authority with respect to the medical care of inmates in the jail, by virtue of authority delegated to CCS and its agents or employees both contractually and by virtue of the custom of the county to defer to CCS with respect to all medical decisions, policies, and treatment protocols impacting inmates in the jail.

205.    In its capacity as policymaker and final decision-maker with respect to the medical care of inmates in the Gwinnett County Jail, Defendant CCS and its agents or employees were deliberately indifferent to the serious medical needs of Chris, and the deliberate indifference was tantamount to official county policy.

206.     The acts and omissions of deliberate indifference by CCS and its agents or employees constituted final decisions by the county's policy-maker and final decision-maker with respect to inmate medical care for which the county is liable. Alternatively, the deliberate indifference of all the Defendants resulted from official customs and policies of CCS (and thus Gwinnett County) that were the moving force behind the violation of Chris's constitutional rights. Either way, Chris's constitutional rights were violated by CCS as the policymaker and final decision-maker for jail medical care.

207.     By virtue of having delegated exclusive authority to CCS for policymaking and final decision-making with respect to the provision of inmate medical care, Gwinnett County is liable for the CCS policies and decisions that caused Chris's rights to be violated.

208.     Gwinnett County and CCS did not have adequate policies regarding provision of outside emergency medical care to inmates suffering medical emergencies. The County and CCS did not have adequate policies regarding the medical personnel's authority or ability to get inmates access to medical care, particularly if non-medical personnel were hindering such access to medical care. To the extent that such policies existed they were unconstitutionally applied in this case. Either way, such policies were defective and a moving force behind the violation of Chris's constitutional rights because they caused both detention and medical personnel to be deliberately indifferent to his serious medical needs in reliance upon such policies, for which both Gwinnett County and CCS are liable.

209.     Chris's suffering and death was proximately caused by the above-described deliberate indifference of all the Defendants, which represented the official policy of the Gwinnett County Jail for which Gwinnett County and CCS are liable under Section 1983 for causing Chris to be deprived of his rights under the Fourth and Fourteenth Amendments.

## Count VII

### Negligence and Professional Malpractice by Defendants CCS, Dillon, Edouard, and Barclay

210.    Plaintiff incorporates paragraphs 1 through 158 of this Complaint as if fully stated herein.

211.    Defendants CCS, Dillon, Edouard, and Barclay owed Chris a duty to exercise the degree of care and skill ordinarily possessed and exercised by physicians, nurses and other medical professionals under like conditions and similar circumstances.

212.    Defendants CCS, Dillon, Edouard, and Barclay violated the standard of care in at least the following ways:

      a.    Failing to call 911 or otherwise obtain emergency medical help after learning that Chris's seizure was prolonged;

      b.    Failing to provide any treatment for Chris's seizure for approximately 12 minutes; and

      c.    Failing to provide or obtain appropriate treatment for Chris's condition at any point from its inception until emergency medical personnel were called.

213.    The affidavit of Sherrie Thomas, R.N. is attached as Exhibit 1 and incorporated by reference.

214.    Defendant CCS is vicariously liable for the negligence of Defendants Dillon, Edouard, and Barclay.

215.    Defendant CCS was additionally negligent in at least the following ways:

      a.    Failing to provide reasonable training to the jail medical personnel;

      b.    Failing to provide adequate medical staff for the jail;

c. Hiring personnel who were not appropriately qualified for their positions; and

d. Failing to provide reasonable supervision of its employees at the jail.

216. As a direct and proximate result of Defendants CCS, Dillon, Edouard, and Barclay's negligence, Chris experienced pain and suffering, and died.

## DAMAGES

217. As a direct and proximate result of the conduct of the Defendants described in this Complaint, Chris suffered bodily injuries and death.

218. Plaintiff Robert Howard is entitled to recover for the full value of the life of Christopher Howard as determined by a jury.

219. The Estate of Christopher Howard is entitled to recover for Chris's conscious pain and suffering, medical expenses, burial expenses, and all other damages which may be authorized by law.

220. Because the conduct of Defendants was malicious, intentional, and carried out in bad faith, and because Defendants acted with deliberate indifference and conscious indifference to constitutional rights, Plaintiff is entitled to recover punitive damages against all Defendants except for the county to the extent it may be exempt by law from punitive damage awards.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court award the following relief from Defendants:

a. An award of compensatory damages in an amount to be proven at trial, including interest;

b.	An award of punitive damages in favor of Plaintiff against all Defendants except for Gwinnett County;

c.	Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988, O.C.G.A. § 13-6-11, or other applicable law; and

d.	Such other and further relief as the Court may deem just and proper.

Dated: January 24, 2019.

/s/Eric S. Fredrickson
Matthew S. Harman
Georgia Bar No. 327169
Eric Fredrickson
Georgia Bar No. 489783

HARMAN LAW FIRM LLC
3575 Piedmont Road
Building 15, Suite 1040
Atlanta, Georgia 30305
Phone: (404) 554-0777
Fax:	(404) 424-9370
Email: mharman@harmanlaw.com
	efredrickson@harmanlaw.com

*Attorneys for Plaintiff*

EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-41**

**JAN 24, 2019 06:04 PM**

Angie T. Davis, Clerk of State Court
Cobb County, Georgia

# EXHIBIT 1

STATE OF TENESSEE

COUNTY OF RUTHERFORD

## <u>AFFIDAVIT OF SHERRIE L. THOMAS, R.N.</u>

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, Sherrie L. Thomas, R.N., who after being duly sworn, deposes and states as follows:

1. I am Sherrie L. Thomas. I am over the age of majority and suffer from no mental or physical disability which prevents me from giving this Affidavit.

2. This affidavit is based on my own personal knowledge, medical records pertaining to Christopher Howard, video from Gwinnett County Jail, and my education, training, and experience.

3. I am a licensed registered nurse in the state of Tennessee. In 2005 I received a Licensed Practical Nursing Diploma from Tennessee Technology Center. I have worked as a nurse continually since 2005. From 2005 to 2015, I worked as a nurse for the Rutherford County Sheriff's Office. From 2015 to the present, I have worked as a nurse at Trustpoint Hospital. A copy of my curriculum vitae is attached as Exhibit A and incorporated herein by reference.

4. I am aware that this Affidavit is being used in support of certain allegations of professional negligence alleged against the below referenced nurses, and those for whom they may have been an employee or agent.

5. Based upon my education, training, and experience, I am familiar with, have personal knowledge of, and am qualified to testify as to the applicable standard of care exercised by nurses generally ("the standard of care") in the care and treatment of patients such as Christopher Howard. In particular, I am familiar with the standard of care applicable to nurses in the care and treatment of patients, such as Christopher Howard, who suffer seizures while in the custody of a correctional facility.

6. I have reviewed medical records from Gwinnett County Jail, video from Gwinnett County Jail, and medical records from Gwinnett Medical Center. Based upon my education, training, and experience, as well as my review of the above-referenced materials, I make the following observations:

   a. On February 15, 2017, Christopher Howard suffered a seizure while in an admissions cell at Gwinnett County Jail.

   b. Nurses Catherine Dillon, Estella Barclay, and Myrium Edouard responded to the cell.

   c. After approximately 12 minutes, Nurse Edouard administered a one millilitre injection of Ativan, an anti-seizure medication.

   d. The seizure continued for over 16 minutes in total.

   e. The nursing staff did not call 911 or otherwise attempt to obtain emergency medical services from outside the facility.

7. In my professional opinion, the standard of care requires nurses to call for emergency medical services as soon as possible when a patient experiences a seizure lasting longer than approximately five minutes.

8. In my professional opinion, the nurses responsible, including the nurses discussed above, deviated from the standard of care and skill exercised by nurses generally under the same conditions and like surrounding circumstances.

9. I give this Affidavit pursuant to O.C.G.A. § 9-11-9.1 for the purpose of setting forth at least one negligent act or omission in the medical care of Christopher Howard and to demonstrate that this is a bona fide claim. This Affidavit is not intended to, nor do I understand that it must, set out all of the opinions that I hold or that I may hold in this matter, especially after further investigation. I reserve the right to amend or alter these opinions should further investigation require me to do so.

This 14th day of December, 2018.

SHERRIE L. THOMAS

Sworn to and subscribed before me
This 14 day of December, 2018.

Notary Public

My commission expires: 22 May 2022

2